## PUERTO RICO RY. LIGHT & POWER CO. v. UNITED STATES.

### No. 3801.

Circuit Court of Appeals, First Circuit.

Nov. 27, 1942.

John J. Burns, of Boston, Mass., and Henri Brown, of San Juan, Puerto Rico (John F. Rich, of Boston, Mass., of counsel), for appellant.

John P. Hearne, Atty., Dept. of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., Vernon L. Wilkinson, Atty., Dept. of Justice, of Washington, D. C., and Philip F. Herrick, U. S. Atty., of San Juan, Puerto Rico, on the brief), for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

We are obliged in this case to set aside a judgment entered July 10, 1942 by the District Court of the United States for Puerto Rico in a condemnation proceeding, adjudging and decreeing that title to the properties of the Puerto Rico Railway Light & Power Company is vested in the United States and authorizing the United States to enter upon and take possession of the premises on and after July 20, 1942.

The original petition for condemnation was filed on June 29, 1942 by the United States Attorney at the direction of the Attorney General, pursuant to the request of the Federal Works Administrator under the provisions of the amended Lanham Act,

55 Stat. 361.[1] Accompanying the petition were a lengthy Declaration of Taking describing the various properties to be taken, a Motion for Judgment on Declaration of Taking and an Order to Surrender Possession, and a deposit by the United States of $6,250,000, the estimated amount of compensation due—all in accordance with the condemnation procedure authorized by the Act of February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. §§ 258a–258e. On the same day that the petition was filed, the court

[1] The Act of June 28, 1941, 55 Stat. 361, amended the Act of October 14, 1940, 54 Stat. 1125, by inserting after § 3 thereof the following:

"Title II [Subchapter III]

"Defense Public Works

"Sec. 201. It is hereby declared to be the policy of this title [subchapter] to provide means by which public works may be acquired, maintained, and operated in the areas described in section 202 [1532 of this title]. As used in this title [subchapter], the term 'public work' means any facility necessary for carrying on community life substantially expanded by the national-defense program, but the activities authorized under this title [subchapter] shall be devoted primarily to schools, waterworks, sewers, sewage, garbage and refuse disposal facilities, public sanitary facilities, works for the treatment and purification of water, hospitals and other places for the care of the sick, recreational facilities, and streets and access roads.

"Sec. 202. Whenever the President finds that in any area or locality an acute shortage of public works or equipment for public works necessary to the health, safety, or welfare of persons engaged in national-defense activities exists or impends which would impede national-defense activities, and that such public works or equipment cannot otherwise be provided when needed, or could not be provided without the imposition of an increased excessive tax burden or an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage exists, the Federal Works Administrator is authorized, with the approval of the President, in order to relieve such shortage—

"(a) To acquire * * * improved or unimproved lands or interests in lands by purchase, donation, exchange, lease * * * or condemnation (including proceedings under the Acts of August 1, 1888, 25 Stat. 357, March 1, 1929, 45 Stat. 1415, and February 26, 1931, 46 Stat. 1421 [sections 257, 258, 361–368, 258a–258e of Title 40]), for such public works.

"(b) By contract or otherwise * * * to plan, design, construct, remodel, extend, repair, or lease public works, and to demolish structures, buildings, and improvements, on lands or interests in lands acquired under the provisions of subsection (a) hereof or on other lands of the United States which may be available (transfers of which for this purpose by the Federal agency having jurisdiction thereof are hereby authorized notwithstanding any other provisions of law), provide proper approaches thereto, utilities, and transportation facilities, and procure necessary materials, supplies, articles, equipment, and machinery, and do all things in connection therewith to carry out the purposes of this title [subchapter].

"(c) To make loans or grants, or both, to public and private agencies for public works and equipment therefor, and to make contributions to public or private agencies for the maintenance and operation of public works, upon such terms and in such amounts as the Administrator may consider to be in the public interest. As used in this paragraph, the term 'private agency' means any private agency no part of the net earnings of which inures to the benefit of any private shareholder or individual.

"Sec. 203. (a) In carrying out this title [subchapter]—

\* \* \* \* \* \* \*

"(2) wherever practicable, utilization shall be made of existing private and public facilities or such facilities shall be extended, enlarged, or equipped in lieu of constructing new facilities;

"(3) public works shall be maintained and operated by officers and employees of the United States only if and to the extent that local public and private agencies are, in the opinion of the Administrator, unable or unwilling to maintain or operate such public works adequately with their own personnel and under loans or grants authorized by this title [subchapter]; * * *.

"Sec. 204. The sum of $150,000,000, to remain available until expended, is hereby authorized to be appropriated to carry out the purposes of this title [subchapter] and for administrative expenses in connection therewith, including personal services and rent in the District of Columbia and elsewhere, printing and binding, and purchase, repair, operation, and maintenance of motor-propelled passenger-carrying vehicles." 42 U.S.C.A. §§ 1531–1534.

below entered an ex parte judgment vesting title in the United States and ordering immediate surrender of possession. This judgment was shortly thereafter vacated upon motion by defendant. The United States filed an amended petition for condemnation, by leave of court, and renewed its motion for judgment on the Declaration of Taking. Defendant demurred to the amended petition, asserting its insufficiency on various legal grounds. After hearing and argument, the court in an opinion rejected the contentions of the defendant, and on July 10, 1942 entered the judgment now appealed from.

 At the outset the United States challenges our jurisdiction to entertain the appeal, on the ground that the judgment is not a "final decision" within the meaning of § 128 of the Judicial Code, 28 U.S.C.A. § 225. It is said that the judgment merely determined the Government's right to condemn, leaving damages for the taking yet to be assessed, and that it is therefore not a final and appealable judgment. This contention has been squarely rejected by the Second Circuit in a careful opinion reviewing all the authorities. United States v. 243.22 Acres of Land, 2 Cir., 1942, 129 F. 2d 678. We agree with this decision. See also City of Oakland v. United States, 9 Cir., 1942, 124 F.2d 959, certiorari denied, 1942, 316 U.S. 679. A lengthy opinion by us on the point would therefore be superfluous. The judgment now in question is a "final decision", for purposes of appealability, within the principle of the following decisions of the Supreme Court: Forgay v. Conrad, 1848, 6 How. 201, 204, 12 L.Ed. 404; Thomson v. Dean, 1868, 7 Wall. 342, 345, 19 L.Ed. 94; Ex parte Farmers' Loan & Trust Co., 1889, 129 U.S. 206, 213–215, 9 S.Ct. 265, 32 L.Ed. 656; Knox National Farm Loan Ass'n v. Phillips, 1937, 300 U. S. 194, 197, 198, 57 S.Ct. 418, 81 L.Ed. 599, 108 A.L.R. 738. Luxton v. North River Bridge Co., 1893, 147 U.S. 337, 13 S.Ct. 356, 37 L.Ed. 194, relied on by the United States, is adequately distinguished in United States v. 243.22 Acres of Land, supra, at page 682 of 129 F.2d. We said in Hubert Hermanos, Inc. v. People of Puerto Rico, 1 Cir., 1941, 118 F.2d 752, 757: "A 'final decision' is not necessarily the ultimate judgment or decree completely closing up a proceeding. In the course of a proceeding there may be one or more final decisions on particular phases of the litigation, reserving other matters for future determination."[2] Under the earlier act of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. §§ 257, 258, establishing the procedure for the judicial condemnation of land, there could be no judgment affecting title or possession until after the damages had been determined. It was the particular purpose of the Act of February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. § 258a–258e, to sever the taking of title and possession from controversies as to valuation, and to provide a procedure whereby the United States might be speedily and conclusively vested with title and possession, with authority to demolish existing structures on the condemned land, leaving the issue as to the amount of compensation to be determined in subsequent proceedings.[3] The judgment on the declaration of taking, having this final and immediate effect on property rights, obviously should be reviewable at once, without the necessity of awaiting the outcome of long drawn out controversies as to valuation. Therefore, on reason as well as on authority, we hold that the judgment in question is a "final decision" within the meaning of § 128 of the Judicial Code.

---

[2] On certiorari, the Supreme Court made no comment on the jurisdictional issue we had decided, but reversed our decision on the merits. Puerto Rico v. Rubert Hermanos, Inc., 1942, 315 U.S. 637, 62 S.Ct. 771, 86 L.Ed. 1081. The judgment in the case at bar is even more clearly a "final decision" than was the judgment appealed from in the Rubert Hermanos case.

[3] Under the Act of February 26, 1931, it is provided that upon the filing of the declaration of taking and of the deposit in court of the estimated amount of compensation, title "shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto." Title thus vests automatically, prior to any judgment of the court. At that point there is no judgment upon which an appeal can be taken. But if the United States wishes to get immediate possession it must, as it did here, move for judgment on the declaration of taking, ordering the parties in possession to surrender possession on a designated day. In granting such a motion, the court necessarily has to decide, as it did here, that the taking was duly authorized by law.

We pass, then, to a consideration of the merits.

The amended Lanham Act declares it to be the policy of the act to provide means by which "public works" may be acquired, maintained, and operated in areas or localities found by the President to be suffering an acute shortage of public works or equipment for public works necessary to the health, safety or welfare of persons engaged in national-defense activities. We think that facilities for the generation and transmission of electricity for purposes of light and power may be comprehended within the term "public work", defined in § 201 as meaning "any facility necessary for carrying on community life substantially expanded by the national-defense program." Various alternative methods are provided for remedying the acute shortage of public works or equipment for public works which the President may find to exist in any area or locality. Under § 202(a) the Federal Works Administrator is authorized "with the approval of the President" to acquire improved or unimproved lands or interests therein by purchase, donation, exchange, lease, or condemnation, for such public works. In § 202(b) the Administrator is authorized, with the approval of the President, by contract or otherwise, to plan, design, construct, remodel, extend, repair or lease public works, and to demolish structures and improvements, on lands acquired by condemnation under subsection (a), to provide proper approaches thereto, also utilities, and transportation facilities, and to procure necessary materials and equipment in connection therewith. Under § 202(c) the Administrator is authorized, with the approval of the President, to make loans or grants, or both, to public and private agencies for public works and equipment therefor, and to make contributions to such agencies for the maintenance and operation of public works.

Senator Maloney, the chairman of the Senate committee which reported the bill, expressed his concern lest the limited appropriation would soon be exhausted in attempts to meet the requests of the communities of the nation "unless very great care is exercised." He emphasized the importance of the provision requiring approval by the President. Thus, he said, "The bill provides that it shall be administered by the Federal Works Administrator, although it also requires that whatever he does must be with the approval of the President of the United States, and that nothing may be done except with the President's approval." And again he said: "The bill first provides that the President himself must find a need. He must authorize the work; and thereafter, if we pass the bill in its present form, the Federal Works Administrator and those under him will proceed with the work." 87 Cong.Rec. 5090-91 (1941). See also, a later colloquy at p. 5093.[4] From the text of the act and from the legislative history we are satisfied that the President is required to approve at least in main outline the particular plan, program, or project formulated by the Administrator for the relief of the defined shortage of public works or equipment therefor, before the Administrator is authorized to proceed. It is not enough that the President, after finding the existence of an acute shortage of public works in a given area or locality, should give the Administrator authority, carte blanche, to relieve such shortage by any of the various methods described in § 202 which the Administrator might thereafter deem expedient.

In the amended petition for condemnation it is stated that on June 8, 1942, the President, pursuant to Title II of the amended Lanham Act, found:

"(a) That an acute shortage of public works and equipment therefor, necessary to the health, safety and welfare of persons engaged in national defense activities, existed or impended, which would impede national defense activities, in and about the area or locality of Puerto Rico, with reference to electrical transmission and distribution facilities and properties and facilities incidental thereto;

"(b) That such public works and equipment therefor could not otherwise be provided when needed, or could not be provided without imposition of an increased excessive tax burden and an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage existed."

Further, it is alleged that on the same date, the President, in the same finding above referred to, "approved action by the Federal Works Administrator by any of the methods prescribed by the act [the

---

[4] In addition, see S.Rep. 408, 77th Cong., 1st Sess. (1941) p. 2; H.Rep. 489, 77th Cong., 1st Sess. (1941) p. 3.

amended Lanham Act, § 202] to relieve the shortage to which the finding of the President of the United States related, to wit, a shortage in the electrical transmission and distribution facilities and other properties and facilities incidental thereto."[5]

The foregoing allegations, admitted on demurrer, are insufficient in law, in that they do not allege that the President had given his approval to the particular project determined upon by the Administrator for the relief of the shortage, namely, the condemnation of the properties of the Puerto Rico Railway Light & Power Company extending over thirty-five municipalities in the Island of Puerto Rico. With the emphasis placed by Congress on economy of administration, on avoidance of duplication, on utilization or enlargement of existing facilities wherever practicable, we think that Congress never intended to commit to the Administrator the discretion to embark upon any such expensive program of condemnation as here presented, without specific approval by the President.

Since this defect is one which might be cured upon remand by a further amendment of the petition for condemnation, or by the filing of a new petition, we do not rest our decision on this ground alone, but proceed to consider a more serious objection urged against the judgment below, namely, that the act gives no authority for the condemnation and taking over as a going concern of the properties, real and personal, of a privately owned public utility.

It now becomes necessary to examine more closely what has been taken over here, as confirmed by the judgment under review.

Schedule A of the Declaration of Taking begins with the following general statement:

"Part 1.

"The lands and interests in lands hereby taken and estates therein.

"The estates taken for such public use are the full and absolute title of the Porto Rico Railway, Light & Power Company in and to all lands, servitudes, easements, and rights-of-way together with all improvements thereon and appurtenances thereto including machinery, instruments, implements, rolling stock and automotive equipment in any building and upon any land which tend directly to meet the needs of the business, systems, industry, and works of said company located in the Island of Puerto Rico. The properties in so far as the description thereof is available in the public records are more particularly described as follows: * * *."

Then follows a detailed description of the various parcels of land owned by the company throughout the island; also cer-

---

[5] A certified copy of the letter of the President has been filed with the clerk of this court. The letter reads as follows:

"The White House
"Washington June 8, 1942

"My dear Mr. Administrator:

"Pursuant to Title II of the Act of October 14, 1940 (Public No. 849, 76th Congress), as amended, I hereby find that an acute shortage of public works and equipment therefor, necessary to the health, safety, or welfare of persons engaged in national defense activities, exists or impends, which would impede national defense activities, in and about the following place:

| Place | Public Works and Equipment Required | Total Estimated Cost |
|---|---|---|
| Puerto Rico | Electrical transmission and distribution facilities and other properties and facilities incidental thereto. | $10,000,000 |

"I further find that such public works and equipment therefor cannot otherwise be provided when needed, or could not be provided without the imposition of an increased excessive tax burden or an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage exists.

"I hereby approve your taking action by any of the methods prescribed by said Act, as amended, to relieve such shortage.

"Very sincerely yours,

"(Signed) Franklin D. Roosevelt

"General Philip B. Fleming
 Federal Works Administrator
 Washington, D. C."

tain parcels over which the company has easements or rights of way, with transmission lines, equipment and apparatus thereon. Part 1 concludes with this statement: "The sum of money estimated by the acquiring authority to be just compensation for the aforesaid land in this proceeding and hereby taken is $6,250,000." Part 2 of Schedule A begins with the following:

"A general statement of the systems and facilities located on and forming a part of the land, interests in lands and improvements thereon, hereby taken.

"All of the lands, improvements and appurtenances in the Island of Puerto Rico owned by the Porto Rico Railway Light & Power Company, including: dams, reservoirs, penstocks, plants, powerhouses, substations, tunnels, canals, buildings, turbines, generators, switchboards, and other electric generating equipment; all transmission lines and distribution system including poles, transformers, insulators, guys, wires, meters and other equipment necessary or incidental to the transmission and distribution of electric power and the control thereof; all office buildings, storehouses and officers' and employees' dwellings; all telephone lines and equipment necessary or incidental to the transmission of telephone messages; all of the road bed and rolling stock, including tramway cars, rails and ties, wires and equipment, of the tramway system operated in and between San Juan and Santurce; and all easements, rights-of-way and other rights and interests owned or enjoyed by the Porto Rico Railway Light and Power Company in any way related or incidental to the operation of an electric system and tramway system in the Island of Puerto Rico; all of said properties being and consisting of electrical transmission and distribution facilities and other properties and facilities incidental thereto."

Thereafter follows a detailed description of the "electric system", stated to consist primarily of three hydroelectric power plants, and one steam plant, including dams, reservoirs, powerhouses, generating equipment, buildings, materials and supplies, together with all lands, easements and rights of way acquired for use in connection therewith, all transmission lines of the company's system, all its distribution lines and systems consisting of poles, wires, distribution transformers, service lines, service connections, meters and similar equipment, and all secondary distribution lines.

The "tramway system" is then described as consisting primarily of "an electric railway passenger transportation system" operating over a described route and "All the rails, ties, tracks, improvements, terminals, structures, repair shops, rolling stock, feeders, transmission poles and distribution lines, brackets, rotary converters, switchboards and transformers, together with all lands, easements, rights-of-way and other interests in land, used therefor or acquired for use in connection therewith." Part 2 of Schedule A then concludes with the following: "The above description of the electric and tramway system is intended to cover and include all of the lands, easements, rights-of-way and other interests in lands, properties, systems, plants and equipment of the Porto Rico Railway Light and Power Company in Puerto Rico."

A supplement to the description of the properties taken, containing additions and corrections to Schedule A of the Declaration of Taking, was filed July 6, 1942. This supplement recited: "That on June 29, 1942, a declaration of taking and petition for condemnation were filed herein taking and condemning, among others, all of the properties of the Porto Rico Railway Light and Power Company in Puerto Rico."

It further recited that this supplement, together with the original declaration of taking, "constitutes a full and complete description of all of the properties of the Porto Rico Railway Light & Power Company in Puerto Rico, sufficient for an identification thereof."

The judgment of the District Court does not set out in detail the property to be taken but incorporates by reference the declaration of taking as supplemented. It adjudges and decrees that: "The title to the property of the Puerto Rico Railway, Light & Power Company described in Schedule A, as supplemented, which is attached to the amended petition and made a part thereof, is vested in the United States of America."

From the foregoing it seems clear that all the properties of appellant, real and personal, have been taken over as a going concern. We are informed that pursuant to the judgment the United States has taken possession of these properties in their entirety and has turned the same over to the Puerto Rico Water Resources Authority to operate.

We have difficulty in stating any coherent theory of the Government's case. The

President's finding is that there is an acute shortage of electrical transmission and distribution facilities and other properties and facilities incidental thereto. There is no finding of a shortage of electric generating facilities; yet the generating plants are taken over. There is no finding of a shortage of transportation facilities; yet appellant's tramway system is taken over. It is not clear just how a condemnation of the power plants and of the tramway system is supposed to relieve a shortage of electrical transmission and distribution facilities. It was suggested by counsel for the Government, at the argument before us, that while the island of Puerto Rico as a whole may not need additional electrical distribution facilities, the Puerto Rico Water Resources Authority, which now furnishes electric power to about one half of the island, has insufficient distribution facilities to serve the whole island; that this is the shortage of public works which the President found to exist. At the hearing the Government submitted the following unsworn statement, which the District Court quoted in full in its opinion:

"In support of the Government's motion for immediate possession of the properties of the Puerto Rico Railway, Light and Power Company the following facts and considerations are brought to the attention of the Court:

"On the Island of Puerto Rico there were at the time of the taking in these proceedings three major separate electric utility systems belonging, respectively, to the Puerto Rico Railway, Light and Power Company, the Mayaguez Light, Power and Ice Company and the Puerto Rico Water Resources Authority. The first two are for the most part powered by fuel oil and the last for the most part by water. The Petroleum Coordinator of the United States brought to the attention of the Federal Works Administrator the fact that there was a shortage of tankers necessary to transport fuel oil to Puerto Rico and that this fact would surely interfere with the generation of electric energy by steam which is of course dependent upon fuel oil. He officially requested the Federal Works Administrator to take suitable measures under the Act here involved (The Lanham Act) to remedy the situation. The Federal Works Administrator is Brigadier General Philip B. Fleming, a distinguished member of the Corps of Engineers of the United States Army. After personally considering the matter with all relevant data he concluded that the solution was the complete integration of all three electric systems so as to use the maximum of hydroelectric power throughout the Island and a minimum of steam power and thus conserve the use of fuel oil. In his judgment these arrangements will assure the furnishing of electric power during the war to all the vital military and naval establishments of the Island. These considerations were presented by the Federal Works Administrator to the President who upon consideration of them made the necessary findings and judgment required by the Act of Congress and approved the taking of any steps authorized by this Act to remedy the situation.

"These are the facts:

"The necessity for expeditious possession of these properties is as great as is the necessity for conserving fuel oil on this Island, lessening the need for ships and freeing them for other uses in the theatre of war."

Commenting on this, the District Court stated that it would take judicial notice of the fact that there is a necessity to conserve fuel oil. But the President has not found that there is a shortage of electricity due to insufficient capacity of the hydroelectric generating plants on the island. From the record it appears that appellant's system is interconnected with that of the Puerto Rico Water Resources Authority, and thus is in a position to obtain additional power from that source if a shortage of fuel oil should necessitate a curtailment of output from appellant's steam generating plant. Furthermore, the above quoted statement submitted to the District Court, with every indulgence in its favor, hardly explains the condemnation of appellant's three hydroelectric power plants and its tramway system.

■ Apparently the Government contended in the court below that the Lanham Act not only authorizes the condemnation of land, either improved or unimproved, but also authorizes the acquisition by condemnation of "public works" as defined in the act. Appellant argues that the issue of public versus private power has been a touchy one in Congress for many years, and that legislation intended to authorize the seizure by eminent domain of the properties of privately owned utilities, lock, stock and barrel, would never have been enacted without a bitter fight; yet the com-

mittee reports and the discussions on the floor contain no reference to any such far-reaching authorization. However this may be, we do not have to look beyond the text of the statute. The only power of condemnation is that stated in § 202(a), and that has reference only to "improved or unimproved lands or interests in lands." The District Court seemed to be of the view that this power of condemnation is somehow enlarged by emanation from § 201, which declares it to be the policy of the act to provide means by which public works may be acquired, maintained and operated. But after making this statement of policy the act proceeds in § 202 to specify the various methods by which public works may be acquired. One of these methods is the acquisition by purchase, donation, exchange, lease or condemnation, of improved or unimproved lands; under § 202(b) the United States might construct public works upon land so acquired. Significantly, § 202(b) includes authority to "lease public works" but not to condemn existing public works. Also, this subsection gives authority to procure necessary materials, supplies, articles, equipment and machinery "by contract or otherwise"; but this cannot be read as authorizing the condemnation of such items of personal property. Section 202(c) provides another method by which needed public works may be supplied for the carrying on of community life, namely, by making loans or grants to public or private agencies. In view of the various methods specifically described in § 202 for relieving a shortage of public works, it cannot be implied from the declaration of policy in § 201 that authority is given to acquire by eminent domain all the properties of an existing privately owned utility. Furthermore, the only statutory basis under which title and possession could be immediately vested in the United States pursuant to the declaration of taking, in advance of a judicial determination of the amount of compensation, is the Act of February 26,

1931, 46 Stat. 1421, which relates only to condemnation proceedings instituted by the United States "for the acquisition of any land or easement or right of way in land for the public use." 40 U.S.C.A. § 258a.

If we understand correctly the position taken by the Government on appeal, it does not now contend that anything can be taken by eminent domain under the amended Lanham Act other than "improved or unimproved lands or interests in lands" as provided in § 202(a). But it is argued, somewhat weakly, that this power, in its application to Puerto Rico, includes the taking not only of "fixtures" on the land as defined by the common law, but also machinery and implements which would be regarded by the common law as personal property but which are classified as immovables by destination under the civil law followed in Puerto Rico. We set out in the footnote a portion of § 263 of the Civil Code of Puerto Rico (1930), cited by the Government in this connection.[6]

This argument, which appears to be of the afterthought variety, will not bear the weight of the judgment below. We think it altogether unlikely that Congress intended the power of condemnation given in § 202(a), applicable generally throughout the United States and its territories, to have a peculiar, enlarged meaning as applied to Puerto Rico, and perhaps Louisiana, where civil law concepts prevail. But passing that, on the face of § 263 of the Civil Code, immovables by destination are not regarded as land or interests in land; rather, the generic term is "immovables". Lands are described as one species of immovables. Another species is immovables by destination, described in the Code as "Machinery, vessels, instruments or implements intended by the owner of the tenement for the industry or works that he may carry on in any building or upon any land and which tend directly to meet the needs of the said industry or works." Further-

6 "Section 262.—Things may be immovable either by their own nature or by their destination or the object to which they are applicable.

"Section 263.—The following are immovables:

"1. Lands, buildings, roads and structures of every kind adherent to the soil.

"2. Trees, plants and ungathered fruits, while they are not separated from the land or form an integral part of an immovable.

"3. Everything attached to an immovable in a fixed manner, in such a way that it cannot be separated from it without breaking the matter, or causing injury to the object.
* * * * * * *
"5. Machinery, vessels, instruments or implements intended by the owner of the tenement for the industry or works that he may carry on in any building or upon any land and which tend directly to meet the needs of the said industry or works.
* * * "

500

more, a large part of the personal property described in the declaration of taking does not even constitute immovables by destination under the doctrine of the civil law, which relates only to machinery, implements, etc. placed by the owner upon his own land to meet the needs of the business or industry which he conducts thereon. Transmission and distribution lines of appellant located on public highways and across lands over which appellant has merely an easement or right of way, do not become immobilized. The same is true of the rolling stock and equipment of the tramway system. See State v. Mexican Gulf Ry. Co., 1843, 3 Rob., La., 513, 518.

▮ As above indicated, the avowed purpose of the Government was to take over by eminent domain appellant's whole electric power and tramway systems, and to effect a complete integration of the same with the properties of the Puerto Rico Water Resources Authority, a public corporation created by Act 83 (1941) Laws P. R., p. 684. This program apparently has been an objective of the insular legislature for some years. See Act 94 (1938) Laws P.R., p. 211; Act 148 (1939) Laws P.R., p. 714; Act 111 (1941) Laws P.R., p. 790. Since the amended Lanham Act authorizes only the condemnation of improved or unimproved lands or interests in lands, the purpose of the taking here necessarily fails. The judgment below will have to be set aside in its entirety, for two reasons: first, because it does not sufficiently appear that the President approved the taking; and second, because if we should affirm the judgment insofar as it applies to the taking of lands and interests therein owned by appellant, that would leave the United States irrevocably committed under the Act of February 26, 1931, 46 Stat. 1421, to the payment of compensation for something which the Federal Works Administrator might never have dreamed of taking had he correctly apprehended the limited scope of his powers under the act. Taking appellant's lands and easements would quite effectively dismember a going concern, but it is not obvious that this would contribute to the relief of a shortage in electrical transmission and distribution facilities. Appellant will have to be restored forthwith to full possession of all its properties.

The judgment of the District Court is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.