**UNITED STATES of America,**
**Petitioner,**

**v.**

**CERTAIN PARCELS OF LAND IN THE COUNTY OF FAIRFAX, COMMONWEALTH OF VIRGINIA, and Belle Haven Realty Corporation et al., Defendants,**

**W. Ralph Davis, Frank A. Leamy, Margaret M. Boothe, Individually and as officers of Belle Haven Citizens' Association, a corporation, Intervenors.**

**Misc. No. 555.**

United States District Court
E. D. Virginia, at Alexandria.

March 16, 1955.

L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., Robert R. MacLeod, Atty., Dept. of Justice, Washington, D. C., and Perry W. Morton, Asst. Atty. Gen., for the United States.

Frederick A. Ballard and Joseph W. Wyatt, Washington, D. C., and Andrew W. Clarke, Alexandria, Va., for intervenors.

Newell Blair, Washington, D. C., for Belle Haven Realty Corp.

BARKSDALE, District Judge.

For reasons set out in an opinion filed herein on May 18, 1954 (D.C., 121 F. Supp. 268), a contemporaneous order was entered setting down for hearing and determination the following issues of fact, upon such evidence as the parties hereto saw fit to introduce:

(1) Whether or not the taking of the Belle Haven sewer system was for a public purpose;

(2) Whether or not the President approved this specific project, as required by the Lanham Act as amended, 42 U.S. C.A. § 1521 et seq.;

(3) Whether or not funds were allotted for substantial additions or improve-

ments to the Belle Haven sewer system, as required by the Lanham Act as amended; and

(4) Whether or not the Belle Haven Realty Corporation gave its consent to the acquisition by the plaintiff of the Belle Haven sewer system.

On January 17–18, 1955, these issues were tried upon the facts without a jury, and the court does hereby find the facts specially upon each issue, states separately its conclusions of law thereon, and directs the entry of the appropriate judgment:

### Findings of Fact.

(1) Whether or not the taking of the Belle Haven sewer system was for a public purpose.

Counsel for the Government admits that this is a justiciable question, but contends that the taking was clearly for a public purpose, and I agree. It does appear from the evidence that, at the time of the taking, the Belle Haven sewer sytem was an integrated and functioning utility, and that the taking by the Government was for the purpose of including it in a much larger sewer system, primarily at the behest of the County of Fairfax. It further appears that, at the time of the taking, it was contemplated that the entire sewer system, including Belle Haven, would be sold by the Government to Fairfax County, or a sanitary district thereof, and maintained by it. It was the plan of Fairfax County to impose a service charge upon the users of the sewer system sufficient to cover maintenance expenses and amortization of the purchase price paid to the Government. It was the desire of Fairfax County that the Government take and turn over to it the Belle Haven system so that the county would be free to impose service charges on the Belle Haven users of the sewer, which would be uniform with the service charges to others.

Notwithstanding these facts, I find that, under the law, the taking was for a public purpose. In the "Declaration of Policy" (42 U.S.C.A. § 1531) of the Lanham Act " * * * sewage, garbage and refuse disposal facilities, public sanitary facilities, * * * ", are included within the term "public work". Counsel for intervenors, in their contention that the facts here do not justify a finding that this taking was for a public use, rely upon United States v. 1,278.83 acres of land, D.C., 12 F.R.D. 320, and United States v. 209.25 acres of land, D.C., 108 F.Supp. 454. It does not appear to me that the first case supports intervenors' contention. The second case does certainly tend to support their contention, but *sub nom* United States v. Willis, 8 Cir., 211 F.2d 1, this case was reversed and certiorari was denied, 347 U.S. 1015, 74 S.Ct. 871, 98 L.Ed. 1138. On the other hand, the case of United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209, and more particularly the very recent case of Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27, require the finding that the taking of the Belle Haven sewer system was for a public use.

(2) Whether or not the President approved this specific project as required by the Lanham Act as amended.

To prove the required presidential approval, the Government introduced a folder referred to as the "President's Book". This "Book" contains, primarily, a letter from the Acting Administrator of the Federal Works Agency dated March 3, 1942, and the President's reply dated March 11, 1942, which are as follows:

"Mr. dear Mr. President:

"I have assured myself that, within the meaning of Title II of the Act of October 14, 1940 (Public No. 849, 76th Congress), as amended, an acute shortage of public works or equipment for public works, as indicated opposite the name of the place listed below, necessary to the health, safety, or welfare of persons engaged in national defense activi-

ties, exists or impends, which would impede national defense activities, in the area or locality in and about the following place:

| Place | Public Works or Equipment Required | Total Estimated Cost. |
|-------|-----------------------------------|-----------------------|
| Various, in Fairfax County, Virginia | Sewer Facilities | $936,000 |

"I have further assured myself that such public works or equipment cannot otherwise be provided when needed, or could not be provided without the imposition of an increased excessive tax burden or an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage exists.

"A supporting certificate and a summary of the pertinent facts are attached for your further information. The contemplated plan of financing is subject to such revisions as may be advantageous to the Government or necessary to meet the urgent national defense need.

"I recommend, therefore, that the proposed finding submitted herewith be made by you and that you approve my taking action by any of the methods proscribed by said Act to relieve such shortage."

The President's reply is as follows: "My dear General Fleming:

"Pursuant to Title II of the Act of October 14, 1940 (Public No. 849, 76th Congress), as amended, I hereby find that an acute shortage of public works or equipment for public works, as indicated opposite the name of the place listed below, necessary to the health, safety, or welfare of persons engaged in national defense activities, exists or impends, which would impede national defense activities, in the area or locality in and about the following place:

| Place | Public Works or Equipment Required | Total Estimated Cost. |
|-------|-----------------------------------|-----------------------|
| Various, In Fairfax County, Virginia | Sewer Facilities | $936,000 |

"I further find that such public works or equipment cannot otherwise be provided when needed, or could not be provided without the imposition of an increased excessive tax burden or an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage exists.

"I hereby approve your taking action by any of the methods prescribed by said Act to relieve such shortage."

The Acting Administrator's letter recites that "a supporting certificate and a summary of the pertinent facts are attached for your further information." As the project approved is described so vaguely, it is necessary to examine the "supporting certificate" and summary of "the pertinent facts" and all other pertinent evidence, to determine just what the President did approve. The supporting documents referred to by the Acting Administrator and included in the President's Book are a certificate of the Unit-

ed States Public Health Service, a letter from the Surgeon General, and a plat, in the first of which there appears the following:

"Description of Project: The construction of the trunk sewers, pumping stations, and sewage treatment plant, to serve the northeast section of Fairfax County."

"Estimated Cost: 936,000".

The Surgeon General's letter dated February 13, 1942, contains the following:

"*Project Description.* The proposed project provides for the construction of trunk sewers, pumping stations, and a sewage treatment plant to serve the northeast section of Fairfax County. The total cost of the proposed work is estimated at $835,684. by the Applicant."

The only other document in the President's Book is a plat, the legend of which indicates that "This Project" is shown in red. The only things shown in red as comprising "This Project" are trunk sewers, pumping stations, and a sewage treatment plant.

The total estimated cost shown in the President's letter of approval is $936,000. No sewage disposal plant has ever been built as a part of this project. In a letter of October 2, 1942, from the Chief, Projects Division, to the Administrator, the approved project with an estimated cost of $936,000 was described as follows:

"12 inch to 36 inch diameter trunk sewers and outfalls, totalling approximately 16 miles in length; 2 lift stations and approximately 2 miles of 12 inch and 14 inch diameter sewer mains, and a primary sewage treatment plant having a capacity of 40,000 persons, including necessary equipment and land rights."

This letter recommends that the description be now amended to be "approximately 19 miles of 15 inch to 36 inch trunk sewers, including 700 linear feet to temporary subaqueous outfall, includ-

ing appurtenant work and land rights", and that the amount allotted be increased to $1,461,397.87. It would seem, therefore, that, not only the sewage treatment plant, but the pumping stations, were eliminated from the project, and a gravity system with subaqueous outfalls was substituted.

Further considering the evidence bearing on what project the President approved, it appears that, in November, 1941, the County of Fairfax made an application for money for numerous utilities aggregating in excess of two and a quarter million dollars. It appears that in January, 1942 (Government Exhibit 11), Fairfax County revised its application and applied for $972,080. in order to construct a trunk sewer. It is to be noted that this application is solely for a trunk sewer, and in his letter of January 23, 1942 (Government Exhibit 11), to the Federal Works Agency, the County's Consulting Engineer makes it clear that the project for which Government money is requested is solely a trunk sewer, and says:

"The applicant (Fairfax County) will take steps to establish a sanitary district in this area for the purpose of providing the necessary utilities in sewer mains, laterals and water service. This, however, must be referred to public referendum and should not be done until the defense development is of sufficient size to be of taxable value and the defense workers have a voice at the polls. The proposed defense housing project will be all connected with the trunk sewers as their setups include the construction of sewer laterals and mains."

On this application, its Engineer reported to Federal Works Agency on February 5, 1942 (Government's Exhibit 15), its Field Finance Examiner reported to the Federal Works Agency on this project on February 10, 1942 (Government Exhibit No. 16). Both these reports consider only the construction of a trunk sewer, pumping stations and treatment plant. It is quite obvious that no con-

sideration was given to expenditure of Government funds for the acquisition of a sewer system such as Belle Haven, or anything else in the way of sewer facilities, except a trunk sewer, pumping stations and treatment plant. In fact, the Finance Examiner says in his report:

"The Applicant now plans to provide the Project prior to the organization of a sanitary district and to later organize such a district in order to construct and finance sewer mains and laterals to connect to the ·Project."

Both the Finance Officer· and the Engineer reported ·that a sewage· treatment plant was not then necessary and recommended that it be eliminated from the project. However, although never constructed, the treatment plant was included in the project as approved by the President.

It seems clear from the evidence before me that the project approved by the President consisted solely of trunk sewers, pumping stations and treatment plant. I am satisfied that the· project approved by the President was never meant to, nor did it, include, or even consider the inclusion of, the integrated and functioning Belle Haven Sewer System, or any other laterals and mains intended to connect with the trunk sewer. This conclusion is also buttressed by the testimony of the Government's witness, Mr. McNerny, who testified that the acquisition of the Belle Haven Sewer System and the inclusion of it in this project was never even discussed until about July, 1942, some four months after the· President's approval of the project. Of course, I am not of the opinion that it was necessary for every detail or ramification of a project to be included in the President's letter of approval. However, I am definitely of the opinion that, in order for presidential approval to apply to a taking, the property to be taken must have, at ·least generally, been within the ambit of the description of the project. The approved project here only contemplated, and was limited to, trunk sewers, pumping stations, and a treat-

ment plant, the total estimated cost of the project being $936,000. At the time the . President approved this project, there was no thought on the part of anyone that mains, laterals and other sewer facilities connected with, or to be connected with, the trunk sewer, were included in the project. Although the pumping stations and· the treatment plant included in the approved project have been eliminated, it now appears that, in addition to the total estimated cost of the project approved by the President, there has already been allotted, and I presume spent, the additional sum of $723,073.31. How can it be said that the President's approval of a project with a total estimated cost of $936,000 constitutes an approval of a project which has already cost $1,659,073.31, although the treatment plant and pumping stations have been eliminated? But even more important to me as showing lack of presidential approval is the fact that the project as developed is entirely different from the project approved by the President. The approved project was "trunk sewers, pumping stations, and a sewage treatment plant"; the project as developed consists of a trunk sewer and an integrated and comprehensive system of sewer mains, laterals and connections.

I find only two cases shedding light on what is meant by the phrase, " * * * ·with the approval of · the President * * *". In the first one, Puerto Rico Railway Light & Power Co. v. United States, 1 Cir., 131 F.2d 491, at page 495, it is said:

"From the text of the act and from the legislative history we are satisfied that the President is required to approve at least in main outline the particular plan, program, or· project formulated by the. Administrator for the relief of the defined shortage of public works. or equipment therefor, before the Administrator is authorized to proceed. It is not enough that the President, after finding the existence of an acute shortage of public works in a given area or locality, should give

the Administrator authority, carte blanche, to relieve such shortage by any of the various methods described in § 202 which the Administrator might thereafter deem expedient."

In the later case, Wildermuth v. United States, 7 Cir., 195 F.2d 18, 23, under the Lanham Act, the President approved construction of a ten-room school house for an estimated cost of $84,000 upon the basis of a preliminary estimate of $73,660. When it was found that adequate facilities could not be constructed within the sum approved, architects, properly employed by an agent of the Administrator of the Federal Works Administration, prepared additional drawings for a ten-room building to cost an estimated $123,046. These drawings were submitted, but a still larger building of thirteen rooms being proposed, to cost an estimated $169,048, the architects made preliminary drawings for this building, which were accepted. However, prior to any construction work, the Administrator abandoned the project. The architects sued under the Tucker Act for their fees. In holding that the architects could not recover, the court said:

"The Commissioner's ultimate decision, viz., that, irrespective of the rider, plaintiffs were not entitled to additional compensation as a matter of law, was sound. The Lanham Act, as amended, 55 Stat. 362, 42 U.S.C.A. § 1532, provides that the Administrator can undertake such a project as is here involved 'with the approval of the President'. In Puerto Rico Ry. Light & Power Co. v. United States, 1 Cir., 131 F.2d 491, 496, the only reported case interpreting this language, it was held to require the 'approval [of] the particular project determined upon by the Administrator'. It cannot be said that approval of a $73,666 project can be extended to cover first a $123,046 and then a $169,028 undertaking. In the absence of any showing of presidential approval of these latter projects, the Administrator lacked the authority to contract for

their performance. It is axiomatic that contracts with the government must be in strict conformity with the authority conferred before they are enforceable. Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10; Hawkins v. United States, 1877, 6 Otto 689, 96 U.S. 689, 24 L.Ed. 607; In re Floyd Acceptances, 1868, 7 Wall 666, 74 U.S. 666, 19 L.Ed. 169; Mechem on Agency, Sec. 763 (2nd Ed.)."

In the light of these authorities, I find it necessary to, and I do find as a fact, that the President did not approve this specific project as required by the Lanham Act as amended.

(3) Whether or not funds were allotted for substantial additions or improvement to the Belle Haven system as required by the Lanham Act, as amended.

The evidence shows that funds were allotted for the acquisition and addition to the Belle Haven sewer system, of the sewer lines from the subdivision of Fair Haven and from the Anti-Aircraft Battery at Mount Eagle. While these additions were more of a burden than an "improvement", they nevertheless were "additions", and it is also true that funds were allotted for the building of a large trunk sewer, to which the Belle Haven system was connected, and this constituted both an "addition" and an "improvement". I therefore find as a fact that funds were allotted for substantial additions and improvements to the Belle Haven sewer system as required by the Lanham Act, as amended.

(4) Whether or not the Belle Haven Realty Corporation gave its consent to the acquisition by the plaintiff of the Belle Haven sewer system.

The Corporation's answer, filed December 15, 1950, and signed by J. Randall Caton, who has since died, alleges that the Corporation only consented to the taking of the Belle Haven System and the acceptance of nominal damages on the condition that there be no mainte-

nance, operation, construction, reconstruction, replacements, or assessment charges levied against the lot owners.

In its amended answer filed December 24, 1953, after Mr. Caton's death and after the Supreme Court's decision, the Corporation alleged that both its consent to the taking and its agreement to accept nominal damages were conditioned upon there being no maintenance, operation, construction, reconstruction, replacements or assessment charges against the Belle Haven lot owners.

However, the following letters seem to me to make the conclusion irresistible that the Corporation did consent, and its consent was not conditioned upon the incorporation in the order of taking of a provision that the householders be exempted from either a service charge or an amortization charge. Letter from Paul Emmert, Special Assistant General Counsel, Federal Works Agency, to J. Randall Caton, dated July 13, 1942:

"I understand that you want a formal statement of the Government's intention respecting the acquisition of the Belle Haven Sewer System in Fairfax County, Virginia.

"This letter is to advise you that in accordance with the understanding which representatives of this Agency reached with you and Mr. Howell, this Agency intends to acquire by condemnation the entire Belle Haven Sewer facility as well as a right of way to provide a sewer line for the Anti-Aircraft Battery. It is understood that the Land Company will claim only nominal damages. A stipulation to this effect will be filed in the proceeding and it will include such further agreements as may be arrived at between the Company and the Government hereafter."

Letter from Caton to Emmert, dated July 17, 1942:

"I thank you for your favor of July 13th, in which you advise that it is the understanding of the repre-

sentatives of the Federal Works Agency that the Agency intends to acquire by condemnation the entire Belle Haven Sewer Facility as well as a right of way to provide a sewer line for the Anti-Aircraft Battery, and that it is understood that the Corporation will claim only nominal damages. It is agreeable that a stipulation to this effect will be filed in the proceedings when initiated and included in such further agreements as may be arrived at between the Company and the Government hereafter."

Letter from Caton to A. Carter Whitehead, Special Assistant to the United States Attorney, dated May 14, 1948:

"Our Corporation had a meeting yesterday, and we feel that the pending proceedings incorporate the previous agreements that had been entered into between attorneys for the Government and our Corporation.

"As you know, we have never taken the position that the taking of the entire sewer facilities in Belle Haven should include also perpetual maintenance to the present and future residents of Belle Haven.

"We are delighted that the Government has determined to take all of the sewer facilities, with the understanding that these facilities and future sewer facilities in our development and in New Alexandria as to the property owned by us would have available the trunk line sewer without service or tapping fees or costs."

There is no question about the fact that, throughout these negotiations, J. Randall Caton, Jr., acted as attorney and agent for Belle Haven Realty Corporation and that everything he did was fully authorized. I have no doubt that he was thoroughly of the opinion that it was to the advantage of both the Corporation and the householders to have the Government condemn the entire sewer system and lease or sell it to Fairfax County. In his letter to Mr. Daniel L.

Boland, Federal Works Agency, of November 12, 1947, he said in part:

"I trust the Department will determine to condemn the entire Belle Haven System so that it then can be leased or sold in its entirety to Fairfax County, where the County will, of course, have the right to impose such service costs as are necessary.

"I do not believe the property owners of Belle Haven could recover more than nominal damages, if any, for the simple reason that nothing will be taken from them, but that they will be benefitted for a Government Authority being responsible for the maintenance of the entire system."

I cannot escape the conclusion from the evidence before me, principally correspondence, that the Corporation, through Mr. Caton, consented to the taking and agreed to accept nominal damages. He certainly recognized that the householders (he being one of them) would be liable for a service charge. When a service charge was made by the County, it obviously was in a sum sufficient to cover operating and maintenance charges of the Belle Haven System, and also a sum for amortization of the entire system, including the trunk line, which the County had bought from the Government. I believe that Mr. Caton was surprised and disappointed that a sum intended for amortization was included in the service charge. This clearly appears from the answer which he filed for the Corporation on December 15, 1950 However, I cannot find anything in the correspondence to show that he had previously demanded, or that any Government agent had agreed, that there would be no such charge. I am quite sure that Mr. Caton *thought* that the Corporation had an agreement with the Government that the taking of the system for a nominal consideration was conditioned on no charge being imposed on the lot owners for amortization of the trunk line. Quite possibly, if Mr. Caton were alive to testify, he might convince the Court that there actually was such an agreement. However, on the evidence which is in the record, I must and do find as a fact that Belle Haven Realty Corporation gave its consent to the acquisition by the Government of the Belle Haven sewer system for a nominal consideration, which consent was not qualified by any consideration which has not been performed.

Conclusions of Law.

Since on issue No. 2, I have found as a fact that the President did not approve this specific project, as required by the Lanham Act, as amended, it follows that the condemnation sought herein is not authorized by the Lanham Act, which is the authority relied upon by the Government for this taking. I therefor conclude that the condemnation sought by petitioner herein is without authority of law. An order will be entered setting aside the orders vesting title in petitioner, and dismissing this action.