UNITED STATES v. 209.25 ACRES OF
LAND, MORE OR LESS, etc., et al.
Civ. A. No. 283.

United States District Court
W. D. Arkansas, Harrison Division.
Nov. 13, 1952.

Hugh M. Bland, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Willis & Walker, Harrison, Ark., for defendants.

JOHN E. MILLER, District Judge.

A landowner, Virgil D. Willis, hereinafter referred to as the defendant, is contesting the acquisition by condemnation proceedings of an 80.9 acres tract of land by the United States of America, hereinafter referred to as the government, on the ground that the land was not taken for public use and that the designated officials of the government had acted in bad faith or so capriciously and arbitrarily that their action was without adequate determining principle or was unreasoned. The land involved herein is tract O–1468.

The petition of the government was filed November 10, 1950, and in paragraph number one it is alleged that the Congress of the United States, by certain enumerated acts, had provided for the construction and operation of the Bull Shoals Dam and Reservoir on White River in Arkansas and Missouri; that funds had been appropriated for such purpose and that the Secretary of the Army was authorized and directed to acquire in the name of the United States of America title to all lands, easements and rights-of-way necessary for the Bull Shoals Dam and Reservoir project.

In paragraph number two it is alleged:

"That pursuant to and in conformity with said authority (certain enumerat-

ed statutes), the Secretary of the Army has duly selected for acquisition by the United States of America the lands hereinafter described for use in connection with said Bull Shoals Dam and Reservoir project on White River in furtherance of the objects thereof, and said lands are necessary in his opinion to provide for the construction and operation of a flood control dam and reservoir and for such other uses as may be authorized by Congress or by executive order."

On the same date a declaration of taking was filed by the Secretary of the Army and the sum of $1,800 was deposited in the registry of the Court as just compensation for the taking of the land herein involved.

In the declaration of taking it is alleged:

"The public uses for which said lands are taken are as follows: The said lands are necessary adequately to provide for the construction and operation of a flood control dam and reservoir. The lands have been selected by me for acquisition by the United States for use in connection with the establishment of the Bull Shoals Dam and Reservoir and for such other uses as may be authorized by Congress or by executive order."

It will be observed that the petition and declaration of taking were filed prior to the effective date of Rule 71A, Federal Rules of Civil Procedure, 28 U.S.C.A., and service of process was had upon the defendant prior to said date. The defendant then filed, on May 11, 1951, a motion designated, "Motion for Preliminary Determination of Fact and Orders Thereon." In that motion he challenged the right of the government to condemn the land involved herein.

On June 21, 1951, the government filed a motion to strike the motion of defendant challenging its right to acquire the land. On July 9, 1951, the Court overruled the motion to strike, and subsequent to the effective date of Rule 71A, supra, the defendant was granted permission to file an answer under Rule 71A (e) in which he alleged "his objections and defenses to the taking of his property."

It is not necessary to set forth here the objections and defenses alleged by the defendant as they will be referred to and discussed hereinafter. In this connection, however, the government filed a response in which it alleged that it was necessary to acquire the tract of land because it "is a part of the Bull Shoals Dam and Reservoir project and vitally essential in the operation of said dam and project for all uses, including essential collateral uses."

Upon the issues joined the cause was tried to the Court and both parties introduced testimony and various exhibits in support of their respective contentions.

The Bull Shoals Dam and Reservoir Project was authorized by Act of Congress of August 18, 1941, Public Law No. 228, 77th Congress, 55 Stat. 638, which Act, by section 2, 33 U.S.C.A. §§ 701c note, 701m, incorporated section 3 of the Act of June 22, 1936, Public Law No. 738, 74th Congress, 49 Stat. 1571, 33 U.S.C.A. § 701c, as amended by Section 2 of the Act of June 28, 1938, Public Law No. 761, 75th Congress, 52 Stat. 1215, 33 U.S.C.A. § 701c–1, the pertinent language of which, for present purposes, is as follows: "* * * Notwithstanding any restrictions, limitations, or requirement of prior consent provided by any other Act, the Secretary of War [now Secretary of the Army] is hereby authorized and directed to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project * * * for flood control, * * *."

The following undisputed facts appear from the testimony:

The defendant, prior to and at the time of the filing of the petition and declaration of taking by the government, was the owner and in possession of the tract of land herein involved. It is situated approximately 26 air miles and 42 river miles above the location of the dam. The controlling contour line used by the government in selecting and acquiring the land for the construction and operation of the dam and reservoir is the 700 foot mean sea level line. All of the land which the government is taking from the defendant is above the 700 foot contour line with the possible

exception of three tracts of not more than one-quarter of an acre each, situated in short, deep and steep ravines leading down to the lake or reservoir. The lowest elevation along the entire west boundary is 806 feet. That elevation varies from 806 feet to 836 feet mean sea level with the exception that on the east side are situated the three exceedingly rough, steep ravines that cross the east boundary, and the contour line of 700 feet extends into those ravines to the extent of less than one-quarter of an acre in each as above stated.

The Corps of Engineers originally prepared a planning report for the reservoir which included 140,870 acres. Later the acreage was reduced to approximately 101,000 acres. In the original plans contiguous lands owned by one ownership were platted as one tract and in 1949 the Engineers showed the defendant's land as a part of tract O–1405, comprising 209.25 acres, and the Engineers recommended that all of tract O–1405 be acquired. Prior to the filing of the petition and declaration of taking it was ascertained that tract O–1405 was owned by various people and the 209.25 acres were resurveyed and platted in accordance with the individual ownership. This required the original acreage to be placed in four different tracts, to-wit: tract O–1405, lying west and south of the defendant's tract and containing 76.7 acres; tract O–1466, containing 3.4 acres and joining defendant's tract on the northeast; tract O–1467, containing 48.25 acres and joining defendant's land on the east of the south end; and tract O–1468, which is rectangular in shape, being 1980 feet long north and south, containing 80.9 acres, owned by the defendant.

Most of each of the tracts, O–1405, O–1466 and O–1467, lie below the 700 foot contour line, and the part that lies above said land joins defendant's land.

The 654 foot contour line marks the permanent operating level of the water in the reservoir. The water will not reach the 700 foot contour line except in times of flood, and then the water will be allowed to rise to that line but will not remain at that height more than a few days.

The north line of the defendant's tract is the boundary line between the States of Missouri and Arkansas, and it adjoins land owned by the defendant situated in the State of Missouri. There are 18 or 20 acres of the tract in cultivation and capable of producing any kind of crops grown in that area. A good gravel county road enters the land on the north end and crosses the entire tract in a southerly direction. The gravel road leads from one of the main hard-surfaced highways in Missouri and formerly extended to a public ferry across White River south of the defendant's land.

The testimony does not show the exact distance from the boundaries of defendant's land to the 700 foot contour line, but the distance between that contour line and the boundaries of defendant's tract is considerable except in the three ravines as heretofore stated.

Exhibit three introduced by the defendant is a map prepared by the United States Army Engineers and shows the location of the four tracts above mentioned. It shows the 700 foot contour line, which traverses tracts O–1405, O–1466 and O–1467, to be several feet below and a considerable distance from the boundary between those tracts and the tract of defendant.

Exhibit one introduced by the defendant is a map prepared by the Army Engineers and shows the location and boundary lines of defendant's land and the 700 foot contour line. It also shows the small indentations where the said 700 foot contour line crosses the east boundary line of the defendant's land in the ravines heretofore mentioned.

At the time of the filing of the petition and declaration of taking, two farm houses were situated on defendant's land. The houses were not in a good state of repair but were occupied by tenants living on the land.

Mr. Howard C. McKinney, Chief of the Real Estate Division of the Corps of Engineers, testified for the government. He had been employed in such capacity for approximately three years and in other capacities for eleven years. The Corps of Engineers recommended to the Secretary of the Army that the entire acreage of

80.9, owned by the defendant in Arkansas, be included in tract O–1468, but his adjoining land in Missouri was not included. It was the opinion of the Chief of the Engineers that the land was necessary to the proper operation of the dam and reservoir project.

On August 22, 1950, there was a public meeting at Harrison, Arkansas. At that time government's exhibit two, which is a map of the entire reservoir area, was exhibited to the public. On that map the tract of land in question was designated as "Blue Hole Home and Club Sites." Other sites are shown throughout the reservoir area to be used for other purposes, and it was proposed to utilize the defendant's land for home and club sites.

The witness also said:

"The reservoir boundary for the reservoir is blocked out on sectional subdivision lines to include the controlling contour and follow the most feasible sectional subdivision lines or property ownership lines, in order to minimize disturbance, an economic disturbance, and also considered is any parcels that might be left as to their feasibility for use. Their economic value. And in order to avoid excessive severance damages. The area around the water line is acquired for the operation and maintenance of the project."

The witness further testified:

"As a project is placed in operation all the lands above the permanent pool are utilized and some of it is permitted to go back * * * to revert to forest, some of it is leased for agricultural and grazing purposes, and some of it for boat docks and some for development for recreation. I said after the project is placed in operation. Of course those studies go on with the acquisition."

The witness testified that they were compelled to divide the original tract O–1405 into the tracts as hereinbefore stated in accordance with the individual ownership, and then said:

"Since all of that happened after we had made our appraisals and tried to

negotiate on the 1405 as a 209 acre parcel, we felt that the acquisition should go ahead because a part of that was in the low areas and subject to inundation. So therefore we submitted the recommendation in the declaration of taking on just those four parcels for immediate possession. We did that on the 30th of June, 1950. We do not consider that any part of the original tract O–1405 is an economic unit. The investigation of the Engineers in reference to the particular tract involved here did not disclose that the defendant owned other adjoining land in Missouri."

In answer to a question propounded by the Court as to whether tract O–1468 was laid out with the thought in mind of selling the land, after the reservoir filled, to private individuals for homes or to private clubs for construction of club houses, the witness answered:

"That is not proposed for sale. That is proposed for sale similar to Mallard Point on Norfolk where the government lays out an access road and delineates lots or at least at Mallard Point they run about an acre each and each of them face on an access road and each of them face on water and they rent those to individuals for home sites on a 25 year lease at a nominal, not a nominal figure, but a reasonable figure for the rent of the land. Those rentals over there run from $15.00 to $50.00 a year for the land and they have some developments up to fifteen and twenty thousand dollars."

A general information bulletin put out by the Corps of Engineers in July, 1950, expresses what they had in mind. The bulletin states:

"Home and Club Site Area. This area bordering the lake will be subdivided into lots for lease to private individuals or private clubs for the construction of summer homes and clubs. Access roads on government owned land will be provided by the Corps of Engineers. Provision for electric power, water supply and sanitary facilities will be the responsibility

of each individual or club, individually or collectively, and leases will normally be for 25 year duration. Lessees will be required to obtain prior approval of the District Engineer of all structures to be constructed and also required to comply with the state health and sanitary requirements."

In another case in this Court where a somewhat similar question was involved, the government, in answer to an interrogatory propounded by the landowner as to the contemplated use of land lying above the 700 foot contour line, stated:

"Areas of fringe tracts cannot be increased for the purpose of acquiring lands for recreational uses only. The sole purpose for which the lands in Tract No. P–1523 were acquired for the Bull Shoals Dam and Reservoir project was for the operation and maintenance of the reservoir and no consideration was given to the procuring of any of the lands for recreational projects." Copied from the record in Civil Action No. 306, Harrison Division, where the landowner contested the right of the government to take certain fringe or remnant tracts lying above the 700 foot contour line.

The landowner, Virgil D. Willis, testified that in his opinion the land involved herein constituted an economic unit, especially when used in connection with land owned by him and joining on the north the tract involved.

There was also introduced by defendant exhibit number one, a mosaic aerial photograph bearing a 1950 date, numbered eight, prepared by the Corps of Engineers, showing the 700 foot contour line, the 654 foot contour line and the boundary lines of the land taken by the government. Mr. Willis testified from that map and from his own personal knowledge that in many instances the perimeter of the land taken crosses or intersects the 700 foot contour line. The map only showed the immediate area of this land and disclosed that the taking line crossed the 700 foot contour line in more than 60 places on other lands. Such practice prevailed throughout the entire reservoir area, and at no place did the government take land, lying above the 700 foot contour line, in any such amount as that which it seeks to take in this action. Remnants or fringe parcels, not in excess of 10 acres, lying above the 700 foot contour line, were taken along with the adjoining land when in the same ownership. When the taking line crossed the 700 foot contour line the small areas lying in ravines and other such places were disregarded and not taken.

In this connection, Mr. McKinney, the witness introduced by the government, testified that the purpose was to block around the 700 foot contour line. "When you get back in a densely wooded area and up a deep ravine you cut across." Economic considerations were involved. The 700 foot contour line was the controlling line. He further said:

"Well, there is no cut and dried rule for it. We are required to buy enough land for the operation of the reservoir. That is, our operation and maintenance of the reservoir. We are also supposed to follow good real estate practices and adjust the taking line to avoid excessive severance damages. Also to eliminate the remainder of the tract being left that is not economically feasible to the operation. So all of those things enter into it and you can't go back and tie to one of them, except for the fact that we are required to buy enough land for the operation of the reservoir."

At the conclusion of the testimony the parties stipulated that should the Court hold that the government had the right to take the entire tract; that the land was taken for a public use; and that the government had not acted in bad faith or so capriciously and arbitrarily that their action was without adequate determining principle or was unreasoned, that just compensation for the land should be $1,800. However, the government refused to stipulate that the Court, if it sustained the main contention of the defendant, might direct that three tracts, each consisting of one and one-quarter acres, in the three ravines heretofore mentioned, be awarded to the government even if the defendant would waive just compensation for such tracts.

The attorneys for the respective parties have filed excellent briefs in support of their contentions, and in addition the government has favored the Court with copies of briefs filed by it in various cases where the right of the government to condemn a particular tract of land has been questioned.

■ Eminent domain is the right or power to take private property for public use. It is an inherent and necessary attribute of sovereignty and exists independently of constitutional provisions and is superior to all property rights. This right of the government is not contested by the defendant, and as stated in United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 551, 66 S.Ct. 715, 717, 90 L.Ed. 843, "We think that it is the function of Congress to decide what type of taking is for public use and that the agency authorized to do the taking may do so to the full extent of its statutory authority."

The extent of the authority of the Secretary of the Army acting through the Corps of Engineers is "to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project * * * for flood control * * *."

Because, of some statements in the opinion of the Court in the Welch case, supra, Mr. Justice Reed and the Chief Justice did not join in the opinion because they thought that the Court implied that there is no judicial review of the acquiring authority's determination that acquisition of the land involved therein was for a public purpose and within the provisions of the T. V. A. Act, 16 U.S.C.A. § 831 et seq., but Mr. Justice Frankfurter in a concurring opinion said:

"All the cases cited in the Court's opinion sustaining a taking recognize and accept the power of judicial review. I assume that in citing these cases the Court again recognizes the doctrine that whether a taking is for a public purpose is not a question beyond judicial competence."

In the case of United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 255, 91 L.Ed. 209, the Court recognized that the right of judicial review to determine whether a taking is for a public purpose is a judicial question. In the opinion in the Carmack case, supra, Mr. Justice Burton writing for the Court said:

"The power of eminent domain is essential to a sovereign government. If the United States has determined its need for certain land for a public use that is within its federal sovereign powers, it must have the right to appropriate that land. Otherwise, the owner of the land, by refusing to sell it or by consenting to do so only at an unreasonably high price, is enabled to subordinate the constitutional powers of Congress to his personal will. The Fifth Amendment, in turn, provides him with important protection against abuse of the power of eminent domain by the Federal Government."

No doubt the apparent confusion of whether the right of judicial review exists arose because of the numerous cases that have been before the courts and in which it has been held that the legislative determination that the use was public did not exceed the constitutional bounds. In the instant case the government dogmatically contends that the taking of defendant's land was in accordance with the legislative determination and apparently gives little consideration to the right and duty of the Court to review the action of the officials in deciding that the land of the defendant was taken for a public purpose and was necessary for the construction and operation of the dam and reservoir project for flood control. In other words, the position of the government seems to be that since it was within the legislative power of the Congress to authorize the construction of the dam and reservoir and choose the site thereof, that power also extended to the taking of any property which the designated official or officials personally might think was necessary, regardless of the provisions of the statute or the necessity for the taking. Of course, the legislative or administrative determination has great weight, but an administrative agency cannot invoke the political power of the Congress so as to

immunize its action against judicial examination in a contest between the taking agency and the citizen.

The question for review here is not the power of Congress to authorize the selection of a site for a dam and reservoir. There is likewise no question whether the site selected was the best available site as is often the question in the many cases arising from the selection of sites for the erection of public buildings, forts, arsenals, docks and other facilities for the use of the public. The question here is whether the Secretary of the Army and the Corps of Engineers acted in bad faith or so capriciously and arbitrarily in taking the defendant's land that their action was without adequate determining principle or was unreasoned.

The Fifth Amendment to the Constitution provides:

"nor shall private property be taken for public use, without just compensation."

■ This is not a grant of a new power but is a limitation of the power. The taking must be for a public use and then only upon payment of just compensation for the owner. The burden is upon the landowner, the defendant herein, to clearly prove that the action of the officials of the government in selecting and in taking his land was arbitrary and capricious. If the facts disclosed by the testimony show that the land was not taken for a public use or was taken for purposes not within the authority granted to the Secretary of the Army by Congress, it must be held that the officials acted in bad faith or that such action was capricious and arbitrary.

■ The term "public use" as used in the Fifth Amendment is not susceptible of precise definition, but it does include property needed for use by the public through its officers and agents in performing the official duties delegated to them. The duties delegated to the Secretary of the Army are well defined in this case as hereinbefore shown and those duties are confined within the narrow limits of the statute.

The Secretary of the Army in the instant case possesses no such powers or duties as are delegated to the Tennessee Valley Authority.

In United States ex rel. T. V. A. v. Welch, supra, the Court sustained the act of the authority in taking certain tracts of land; the Court in its opinion at page 553 of 327 U.S., at page 718 of 66 S.Ct., set forth the extent of the agency's authority as follows:

"That Act does far more than authorize the T. V. A. to build isolated dams. The broad responsibilities placed on the Authority relate to navigability, flood control, reforestation, marginal lands, and agricultural and industrial development of the whole Tennessee Valley. The T. V. A. was empowered to make contracts, purchase and sell property deemed necessary or convenient in the transaction of its business, and to build dams, reservoirs, transmission lines, power houses, and other structures. It was particularly admonished to cooperate with other governmental agencies—federal, state, and local—specifically in relation to the problem of 'readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisition of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the Act.' All of the Authority's actions in these respects were to be directed towards 'development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this Act * * * all for the general purpose of fostering an orderly and proper physical, economic, and social development of said areas.' To discharge its responsibilities the T. V. A. was granted 'such powers as may be necessary or appropriate' for their exercise. Section 4(h) of the Act gives the T. V. A. the very broad power to 'exercise the right of eminent domain.' Section 4(i) of the Act empowers the Authority to condemn certain specified types of property and concludes by referring to

'all property that it (the Authority) deems necessary for carrying out the purposes of this Act.' * * *"

No such powers were delegated to the Secretary of the Army in the instant case. The government does not and cannot contend that any of the tract belonging to the defendant will be inundated other than possibly three infinitesimal portions located in three different steep ravines in times of high water. Even these small indentations will not be permanently inundated. The testimony reveals that in practically all other similar situations the government cut across the 700 foot contour line, but here the government has taken the entire tract of 80.9 acres, notwithstanding the land is far above and removed from the 700 foot contour line. It has arbitrarily determined that the tract is not an economic unit, notwithstanding all of the testimony shows that the tract, especially when used in connection with the other adjoining land owned by the defendant, is an economic unit. The government cannot be heard to say that the tract is a remnant because it is taking all of the tract. Neither is the question of avoidance of liability for severance damages involved. On the other hand, the facts unmistakably show that someone connected with the government has an idea that the tract of land, situated as it is, is an excellent site for the erection of private homes and clubs, and no doubt the government could recoup some of the cost of constructing the dam by taking land so situated and, as Mr. McKinney, the government witness, testified, later using it for reforestation, agricultural, grazing and recreational purposes.

There have been acquired through this Court by condemnation in more than nine hundred separate ownerships, thousands of acres of land that were necessary for the construction of the Bull Shoals Dam and Reservoir. The Court in the interest of justice may take judicial knowledge of its own records, especially where one of the parties was a party in the other cases and the issues were identical. Funk v. Commissioner of Internal Revenue, 3 Cir., 163 F.2d 796; Ellis v. Cates, 4 Cir., 178 F.2d 791. Also, in the trial the government specifically introduced as government's exhibit three the records pertaining to tract O-1470 in Civil Action No. 298, Harrison Division, United States v. 1,298.-15 Acres in Boone County, D.C., 108 F. Supp. 549. Those records show that various landowners have objected to the government's taking as being excessive. Often it was necessary to conduct a hearing on the objections. A typical case is United States v. 1,096.84 Acres in Marion County, D.C.W.D.Ark., 99 F.Supp. 544.

Never before has the government admitted that the land was acquired for any purpose other than that for which authority was granted. It has heretofore denied that any land was taken for recreational, reforestation, agricultural or grazing purposes. The Court referred to one of the cases in its recital or statement of the facts. The government has contended heretofore in cases where a few acres, which were situated above the 700 foot contour line, were taken, that they were only a remnant or fringe parcel and not of a sufficient area to be of any value to the landowner, or were located in an isolated place and rendered inaccessible by the waters of the reservoir. In the instant case the government seems to have abandoned the former claims and boldly asserts that the land will be used for recreational or other uses in no wise connected with the building and operation of the dam and reservoir.

The Court is persuaded that the real reason for the government's contention in the instant case lies in the fact that the Corps of Engineers originally decided that they could take this land as a part of the original tract O-1405, and when they learned this could not be accomplished they arbitrarily and capriciously decided to take it regardless of need, and when their action was challenged by the defendant they personally decided that the land was suitable for reforestation, grazing, agricultural and recreational purposes. Their field investigations were so inadequate as not to disclose the defendant's ownership of adjoining land in Missouri.

In the case of Cincinnati v. Vester, 281 U.S. 439, 50 S.Ct. 360, 362, 74 L.Ed. 950,

the Court said that the question of what is a public use is a judicial one, and one "which this Court must decide in performing its duty of enforcing the provisions of the Federal Constitution." In that case the plaintiffs had alleged that the excess condemnation was a mere speculation upon an anticipated increase in the value of the property adjacent to the improvements and that the properties were taken with a design to resell the same at a profit to private individuals to be used for private purposes, and that no use of the property by or for the public was contemplated by the City of Cincinnati. The city answered and denied the allegations of the plaintiffs by saying that "the application of the principle of excess condemnation in these cases would enable the city (1) 'to further the appropriate development of the south side of Fifth Street' by using or disposing of the excess properties in tracts 'with such size and with such restrictions as will enure to the public advantage,' and (2) that the increase in value of the properties in question which may accrue by reason of the improvement contemplated by the city 'will pay in part the very heavy expense to which the City will be put in effecting the improvement.' "

The Court in rejecting the contention of the city said at page 447 of 281 U.S., at page 363 of 50 S.Ct.:

"The importance of the definition of purpose would be even greater in the case of taking property not directly to be occupied by a proposed public improvement than in the case of the latter which might more clearly speak for itself."

Further, at page 449, of 281 U.S., at page 363 of 50 S.Ct., the Court said:

"Questions relating to the constitutional validity of an excess condemnation should not be determined upon conjecture as to the contemplated purpose, the object of the excess appropriation not being set forth as required by the local law."

▮ The testimony does not disclose any fact showing that the defendant's land will be used for the purposes set forth in the statute under which the Secretary of the Army proceeded to condemn and take the land. But, the testimony abundantly establishes that the land may be useful to the government in the future for other purposes; that is, such purposes as some planner of the course of the lives of the citizens may have in mind. The action of the government in this case, if sustained, will result in depriving the defendant of his property without due process of law, and in taking his property for a non-public use, contrary to the authority vested in the Secretary of the Army when the Congress directed and authorized him "to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project * * * for flood control".

Consideration of the testimony of the only witness for the government leads unerringly to the belief and conviction that when the facts were ascertained the members of the Corps of Engineers were unwilling to change their recommendation to the Chief of Engineers, and now they seek to justify their silence and failure to correct their error for the reason stated by Mr. McKinney when he said:

"There is (was) no employee of the district that is (was) required to reduce it."

Thus, the government is here trying to sustain its action in taking the defendant's land, because there was no employee in the district who was required to reduce a patently excessive condemnation. They assert that the land is needed for the building of the dam and the operation of the reservoir, but no facts are shown to support this assertion.

The facts uncontrovertibly show that the action of the Secretary of the Army and the Corps of Engineers in this case was without "adequate determining principle or was unreasoned". The action was without "adequate determining principle" because they did not follow the same principle that was followed in other tracts in the same community as well as in the entire reservoir. And, such action "was unreasoned" because they utterly disregarded the location of the land and the admitted fact that it would

never be inundated; that it was a compact tract; that standing alone it was an economic unit, aside from its use with other adjoining land in Missouri owned by defendant; that there were ample means of ingress and egress; that it was not a remnant or portion of a tract but was an entire tract and a separate unit in itself.

Therefore, the judgment of the Court entered at the time the petition and declaration of taking were filed should be set aside and the petition and declaration of taking of the government as to tract O-1468 dismissed, and title revested in defendant as against the United States of America.

An order in accordance herewith is being entered today.