UNITED STATES of America,
Plaintiff,

v.

620.98 ACRES OF LAND, MORE OR
LESS, IN LOGAN AND FRANKLIN
COUNTIES, ARKANSAS, and J. W.
Cotton, et al., and Unknown Owners,
Defendants.

No. 1772.

United States District Court
W. D. Arkansas,
Fort Smith Division.

June 21, 1966.

428

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Dale Bumpers, Charleston, Ark., for defendants.

## OPINION

JOHN E. MILLER, Chief Judge.

The fee simple title to Tract No. 3143, containing 10.50 acres, was acquired by the Government on January 3, 1964, in an eminent domain proceeding in this court. The minerals in and under the land were reserved to the owners but subordinated to the right of the Government to flood. The tract is located on the right bank of the Arkansas River about 4½ miles north of the town of Paris and opposite the western portion of O'Kane Island. It appears to be one-quarter of a mile long east and west and triangular in form. The width gradually narrows from the west boundary line to what appears to be a very few feet in width at the extreme east end. Commissioners were appointed to ascertain just compensation in accordance with Rule 71A(h), Fed.R.Civ. P. A hearing was held on March 3, 1966, at which the landowners appeared in person and by their attorney, Mr. Dale Bumpers of Charleston, Ark. The Government was represented by Assistant U. S. Attorney Robert E. Johnson.

The report of the Commission was filed on March 23, 1966. On March 29, 1966, the landowners gave notice that they desired to file exceptions to the report of the Commission, and on the same date the court granted an additional 30 days in which to file exceptions. Within the time permitted by the order of the court exceptions were filed on April 28, 1966. The landowners have submitted a transcript of the evidence adduced at the hearing before the Commission and excellent briefs in support of their contentions. The Government has sub-mitted brief in opposition thereto. The authorities cited and relied upon by the parties in support of their respective contentions, along with the evidence, have been fully considered by the court.

In paragraph I of the exceptions of the landowners they state:

"The taking of the above numbered tract should be set aside by this court on the grounds that the same was not taken for the public use. It was not known by these petitioners, and could not have been known prior to a trial of this cause before the Commissioners, that the said lands will not be flooded, used for recreational purposes or for any other purpose, and the taking should be set aside as not a taking for the public interest."

Subparagraph (b) of paragraph 1 of the Declaration of Taking, filed by Cyrus R. Vance, Secretary of the Army, on January 3, 1964, is as follows:

"(b) The public uses for which said land is taken are as follows: The said land is necessary adequately to provide for the construction and operation of a flood-control project navigation on the Arkansas River and for other uses incident thereto. The said land has been selected by me for acquisition by the United States for use in connection with the Dardanelle Lock and Dam on the Arkansas River, and for such other uses as may be authorized by Congress or by Executive Order."

The Government in its brief suggests that under Rule 71A, Fed.R.Civ.P., that defendants "have probably waived the judicial determination of the right to take by not contesting the right to take within twenty days from the date of service of notice * * *."

Rule 71A(e), Fed.R.Civ.P., provides:

"If a defendant has any objection or defense to the taking of his property, he shall serve his answer within 20 days after the service of notice upon him. The answer shall identify the property in which he claims to have an interest, state the nature and extent

of the interest claimed, and state all his objections and defenses to the taking of his property."

In due time the landowners filed their answer, and in paragraphs II and III stated:

## "II.

"That the Dardanelle Lock and Dam Project described by the plaintiff will not flood the tract aforesaid and that the United States should not be allowed to take the same in fee.

## "III.

"That in the event the United States would flood the aforesaid tract of land on infrequent occasions, it should be allowed flowage easement over the said tract only."

It thus appears that exception I now urged by the landowners is included in the allegations of the answer and entitles the court to determine the contention of the landowners as hereinbefore set forth.

It is conceded that the land is so situated that it will only be subject to overflow possibly once in fifty years. The surface of the tract will be approximately 20 feet above the normal level of the water in the reservoir. The landowners earnestly argue that the taking should be set aside and the land restored to the owners upon repayment of the deposit by the landowners.

In United States v. 209.25 Acres of Land, etc., (W.D.Ark.1952) 108 F. Supp. 454, this court, after a consideration of the testimony, at pages 462–463 stated:

"The facts uncontrovertibly show that the action of the Secretary of the Army and the Corps of Engineers in this case was without 'adequate determining principle or was unreasoned.' The action was without 'adequate determining principle' because they did not follow the same principle that was followed in other tracts in the same community as well as in the entire reservoir. And, such action 'was unreasoned' because they utterly disregarded the location of the land and the admitted fact that it would never be inundated; that it was a compact tract; that standing alone it was an economic unit, aside from its use with other adjoining land in Missouri owned by defendant; that there were ample means of ingress and egress; that it was not a remnant or portion of a tract but was an entire tract and a separate unit in itself.

"Therefore, the judgment of the Court entered at the time the petition and declaration of taking were filed should be set aside and the petition and declaration of taking of the government as to tract O–1468 dismissed, and the title revested in defendant as against the United States of America."

The case was appealed, sub nom. United States v. Willis, (8 Cir. 1954) 211 F. 2d 1, and the judgment of the trial court was reversed.

In the case of United States v. Mischke, (8 Cir. 1961) 285 F.2d 628, the question was whether the court had the right to go behind the decision of the Secretary of the Army. The trial court, after considering all of the evidence, set aside the decision of the Secretary of the Army and returned to the landowner the tract which had been taken by the Government in the proceeding. The appellate court in considering the action of the District Court, said at page 631:

"It is true that there are cases from which implications may be drawn that if a district court finds that the officer or agency, authorized by Congress to select lands to be taken for a public use and to determine the necessity for the taking, has acted in bad faith or arbitrarily or capriciously in making the selection, the court may set it aside. See Simmonds v. United States, 9 Cir., 199 F.2d 305, 306; United States v. State of New York, 2 Cir., 160 F.2d 479, 480–481; United States v. Meyer, 7 Cir., 113 F.2d 387, 392.

"In regard to this subject, we said in United States v. Willis, 8 Cir., 211 F.2d 1, 2:

" 'The court [District Court] thus undertook to review the administrative determination of necessity and quantity which had been made, within the qualification of bad faith or arbitrariness and capriciousness, which has sometimes been said—mostly by way of dictum—to warrant judicial overthrow of administrative judgment as to condemnation taking, in relation to the legislative authority granted, and which the Supreme Court itself apparently left open in United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209, when it said, "In this case, it is unnecessary to determine whether or not this selection could have been set aside by the courts as unauthorized by Congress if the designated officials had acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principles or was unreasoned." 329 U.S. at page 243, 67 S.Ct. at page 258.'

"We cannot accept the theory that the assertion by a defendant in a condemnation proceeding that the official, duly authorized by Congress to select the lands necessary to be taken for a public use, has acted in bad faith and arbitrarily and capriciously in making the selection, can transmute what has invariably been held to be a legislative question into a judicial one.

"It is our opinion that the trial court lacked authority to review or to redetermine the question of the necessity for the taking of the 42.5 acres of the Mischke tract."

The court further held: "When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance. * * * The use for which the land is to be taken having been determined to be a public use, the quantity which should be taken is a legislative and not a judicial, question."

■ In view of the decision of the court in Mischke and of the other decisions cited and referred to therein, this court is of the opinion that if it has the authority to review or redetermine the question of the necessity for the taking of the tract of land involved herein, the evidence does not establish that the Secretary of the Army acted in bad faith or arbitrarily or capriciously in making the selection of the tract herein involved.

The court now reaches the second exception, which is stated as follows:

"Alternatively, the report of the Commissioners should be modified and the amount awarded set according to the evidence adduced, a jury trial granted the petitioners in this court, or the case remanded to the Commissioners for the taking of additional evidence, because of the following erroneous conclusions made by the Commissioners."

In their brief the landowners contend in reference to the exception that "Just compensation as determined by the Commission is not supported by substantial evidence or any evidence at all."

Before discussing the evidence, the contention that a jury trial should be granted to the petitioners should be considered.

On March 22, 1960, the Government filed its first suit to acquire property for use in the construction and operation of the Dardanelle Lock and Dam on the Arkansas River. The court, after a full consideration of all the factors involved, entered an order in that case, Civil Action No. 1528, Fort Smith Division, appointing Commissioners under Rule 71A (h), Fed.R.Civ.P. In all subsequent cases the same order was entered, and the same Commissioners appointed. A major portion of the order appears in United States v. 561.14 Acres of Land, etc., (W.D.Ark.1962) 203 F.Supp. 673, loc. cit. 677–678. In that case, after considering the objections to the appointment of a Commission, the court in the

concluding paragraph of the opinion, p. 680, said:

"This court has had many years' of experience in the trial of eminent domain cases, and is convinced that in projects, such as the Dardanelle Dam and Reservoir Project, Commissioners should be appointed 'in the interest of justice,' and the facts set forth in the various orders appointing the Commissioners in this project demand that the court, in the exercise of its discretion, appoint Commissioners."

▪ Under the law, if the report of the Commission is supported by substantial evidence, the court does not have the right to set aside the findings of fact. The court cannot reconsider, weigh and evaluate the evidence to arrive at its own independent conclusions, but must accept those of the Commission unless clearly erroneous.

The applicable rule 71A(h), Fed.R. Civ.P., provides that the Commission shall have the powers of a Master as provided in subdivision (c) of Rule 53, and paragraph 2 of subdivision (e) of Rule 53 provides:

"In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

See United States v. 992.61 Acres of Land, etc., (W.D.Ark.1962) 201 F.Supp. 578. In McGraw Edison Company v. Central Transformer Corp., (E.D.Ark. 1961) 196 F.Supp. 664, Judge Henley, beginning at page 666, said:

"In passing upon the pending exceptions this Court does not try the factual issues de novo. In this connection Rule 53(e) (II) of the Federal Rules of Civil Procedure 28 U.S.C.A., provides that the Court shall accept the Master's findings of fact 'unless clearly erroneous.' And a factual finding by a Master is not 'clearly erroneous' unless it stems from a mistaken view of the law, or unless, although it be supported by substantial evidence, the Court is thoroughly convinced after a consideration of the evidence that a mistake has been made. United States v. Twin City Power Co., 4 Cir., 248 F.2d 108, certiorari denied 356 U.S. 918, 78 S.Ct. 702, 2 L.Ed.2d 714; Ferroline Corporation v. General Aniline & Film Corporation, 9 Cir., 207 F.2d 912, certiorari denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098; United States v. Waymire, 10 Cir., 202 F.2d 550; Sanitary Farm Dairies v. Gammel, 8 Cir., 195 F.2d 106; 2 Barron & Holtzoff, Federal Practice & Procedure, § 1170, p. 886. It may be noted that the Court is more reluctant to overturn the Master's findings where such findings are based upon conflicting testimony of witnesses who have been seen and heard by the Master than where the findings are simply logical inferences drawn by the Master from documentary evidence, depositions, or undisputed facts. United States v. 15.3 Acres of Land in City of Scranton, D.C.Pa., 154 F.Supp. 770; In re Riddlesburg Mining Co., D.C.Pa., 122 F.Supp. 560; Helene Curtis Industries v. Sales Affiliates, D.C.N.Y., 121 F.Supp. 490, affirmed 2 Cir., 233 F.2d 148, certiorari denied 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80; 5 Moore's Federal Practice, 2d Edition ¶ 53.12(4), pp. 2983–2986. Of course, the Court is not bound by the Master's conclusions of law. 2 Barron & Holtzoff, op. cit. § 1170, pp. 886–887; 5 Moore's, op. cit. ¶ 53.12(5), p. 2989."

▪ The Fifth Amendment to the Constitution of the United States provides that private property shall not be taken for public use without just compensation. In United States v. 992.61 Acres of Land, supra, beginning at page 580 of 201 F.Supp., the court cited and discussed many decisions in which many of the elements of just compensation were set forth. The Constitution and the statutes do not define the meaning of just compensation, but it is generally recognized that just compensation is the value of the interest taken or obtained by the Government. This is not the value to the owner for a particular purpose or to the condemnor for some special use but

is the market value. The special adaptability to his own use of the land with which the owner is reluctant to part is not an element to be taken into account in determining the market value. Just compensation does not exceed market value fairly determined but does include all elements of value that inhere in the property taken. Just compensation does not depend upon the uses to which an owner has devoted his land, but is to be arrived at upon full consideration of all of the uses for which the land is suitable. The highest and most profitable use for which the property is adaptable and needed, or likely to be needed in the reasonably near future, is to be considered, not necessarily as a measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. In awarding just compensation the court should strive to be just to the public as well as to the individual. Just compensation as used in the Fifth Amendment evokes ideas of fairness and equity.

In November 1962, which was less than 15 months prior to the taking of the tract by the Government, J. W. Cotton purchased the land from B. C. Reed for $3,-150. (TR 58–60.) There were no buildings or other improvements upon the property at that time. Mr. Cotton erected and placed on the property a sand and gravel plant for the processing of sand and gravel which was to be obtained from other land. There was no available sand and gravel on the tract. On October 26, 1962, Mr. Cotton leased from the owners a certain portion of O'Kane Island for a term of 18 months commencing January 1, 1963, for the sole purpose of removing sand and gravel from the island to the plant which he had constructed on the land in question. The lease provided that in the event the lessors should sell the property (O'Kane Island) or in the event the property should be condemned by the Government "this lease shall be cancelled immediately and the lessee shall have 30 days in which to remove his facilities and equipment." The lease further pro-

vided that the lease could not be assigned without the written consent of the lessors.

On December 12, 1963, Mr. Cotton and wife entered into an agreement with W. H. Patterson for the sale of the tract and certain equipment described in the agreement and used in the operation of the sand and gravel business, also for the sale of Cotton's undivided ½ interest in a certain amount of processed sand and an undivided ½ interest in a certain amount of gravel, some processed and some unprocessed. Patterson agreed to pay Cotton $18,000 for the equipment and land; $4,250 for the undivided ½ interest in 8,500 yards of sand; and $3,937.50 for Cotton's undivided ½ interest in 4,500 yards of gravel. The written agreement for the sale of the property was, as stated above, entered into December 12, 1963, but Mr. Patterson testified that he actually bought the property on November 14, 1963, "to produce sand and gravel to market." Of the $18,000 paid for the land and equipment described in the contract of December 12, 1963, Mr. Patterson allocated $10,000 thereof to the land and the remainder to the equipment. The other sums paid were as stated for the sand and gravel that Cotton had on hand. The Government acquired title to the land on January 3, 1964, or 1 month and 20 days after the purchase of the land by Mr. and Mrs. Patterson.

The Commission found that the highest and best use of the tract as of the date of taking was for a sand and gravel processing plant. The towns and communities of Paris, Subiaco, Charleston, Booneville, Waldron, Ozark and Huntsville were within the trade territory of the location of the processing plant. Mr. Patterson testified that he sold over $14,-000 worth of material in the 7½ months he operated the plant. In the year 1963 Mr. Cotton paid severance tax upon 5,-760 cubic yards of sand and gravel which were taken from the deposit on O'Kane Island. The contract between Patterson and Cotton did not provide for the assignment of the lease of the deposit of the sand and gravel, and there is no testimony in the record to show how long

the source of supply would have been available even if the lease from the owners of O'Kane Island had been assigned to Mr. Patterson.

The tract was within approximately one-half mile of the source of the raw material. There was an abundant supply of water for washing the sand and gravel. Good roads were available for the transportation of the material to market. There were no permanent buildings or fixtures attached to the land. All of the personal property used in the processing plant has been removed by Mr. Patterson. Prior to and at the time of the purchase of the land by Mr. Patterson, it was common knowledge that the level of the river would be raised when the Dardanelle Project was completed, and even though the tract here involved had not been condemned, the effect of the dam upon the sand and gravel deposit which Mr. Patterson evidently hoped to obtain was unknown.

As heretofore stated, Mr. Patterson allocated $10,000 of the purchase price to the land alone. Nothing was paid for good will, and Mr. Patterson testified that he intended to go into the sand and gravel business. He did not lose any of Mr. Cotton's customers, but was forced to suspend operation by the condemnation of the land. Mr. Patterson testified that in his opinion the value of the land at the time of the taking was $20,000 or $25,000. Mr. Garland Cotton (the record does not disclose whether he was related to J. W. Cotton) testified that if the property had been his, he would have valued it at more than $20,000. Mr. Adam Gibson, an appraiser for the Corps of Engineers, testified that in his opinion the fair market value of the property at the time of the taking was $4,000.

The Commission fixed just compensation for the taking of the tract, with the minerals thereunder subordinated, at $6,000, which in the opinion of the Commission represented the fair market value of the tract for the location of a sand and gravel plant as of the date of taking.

In all probability Mr. Patterson would have been able to have operated a sand and gravel plant there with reasonable success and at a fair profit, if he had been able to retain the source of the sand and gravel.

The action of the Government in condemning the tract ended Mr. Patterson's opportunity to operate a sand and gravel plant from that location. The Government did not appropriate or take the business, and there is an essential difference between frustration and appropriation. The real complaint of the landowners is of the result of the taking of the land. It necessarily destroyed their plans and hopes of establishing and operating a profitable business. In their opinion a prospective business opportunity was lost. United States v. Grand River Dam Authority, (1960) 363 U.S. 229, 80 S.Ct. 1184, 4 L.Ed.2d 1186. Business losses are not compensable. In the case of United States ex rel. T. V. A. v. Powelson, (1943) 319 U.S. 266, at page 281, 63 S.Ct. 1047 at page 1055, 87 L.Ed. 1390, the court said:

"This public project, to be sure, has frustrated respondent's plan for the exploitation of its power of eminent domain. We may assume that that privilege was a thing of value and that this frustration of the plan means a loss to respondent. But our denial of compensation for that loss does not make this an exceptional case in the law of eminent domain. There are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment. The point is well illustrated by two other lines of cases in this field. It is a well settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken (United States v. Miller, supra [317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336]; United States v. Chandler-Dunbar Co., supra, [229 U.S.] p. 81 [33 S.Ct. 678, 57 L.Ed. 1063]; Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195 [30 S.Ct. 459, 460, 54 L.Ed. 725]), not all losses suffered by the owner are compensable under the Fifth Amend-

ment. In absence of statutory mandate (United States v. Miller, supra, [317 U.S.] p. 376 [63 S.Ct. p. 281]) the sovereign must pay only for what it takes, not for opportunities which the owner may lose. See Orgel, Valuation Under Eminent Domain (1936) § 71, § 73. On the one hand are such cases as Monongahela Navigation Co. v. United States, supra, where it was held that the United States had appropriated a going enterprise to its own ends and must make compensation accordingly. But it is well settled in this Court that, 'Frustration and appropriation are essentially different things.' Omnia Co. v. United States, supra [261 U.S.] p. 513 [43 S.Ct. page 439, 67 L.Ed. 773]. Thus in Mitchell v. United States, 267 U.S. 341 [45 S.Ct. 293, 69 L.Ed. 644], the owner was denied compensation for the destruction of his business which resulted from the taking of his land for a public project even though the business could not be reestablished elsewhere. This Court, after noting that 'settled rules of law' precluded a consideration of 'consequential damages' for losses of a business or its destruction, stated: 'No recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the government took the business, or that what it did was intended as a taking. If the business was destroyed, the destruction was an unintended incident of the taking of land.' 267 U.S. p. 345 [45 S.Ct. p. 294, 69 L.Ed. 644]. That which is not 'private property' within the meaning of the Fifth Amendment likewise may be a thing of value which is destroyed or impaired by the taking of lands by the United States. But like the business destroyed but not 'taken' in the Mitchell case it need not be reflected in the award due the landowner unless Congress so provides."

■ The award of $6,000 as just compensation made by the Commission is supported by substantial evidence. In fact, it is 50 percent greater than the market value of the land for agricultural purposes. It is $2,850 more than the land was sold for in November 1962, prior to the installation of the equipment and fixtures for the operation of the sand and gravel plant which, of course, were removed by Mr. Patterson when he was required to vacate the plant.

Therefore, judgment is being entered today approving and confirming the report of the Commission and fixing just compensation at $6,000.00.