## UNITED STATES *v.* CERTAIN PARCELS OF LAND IN THE COUNTY OF FAIRFAX, VIRGINIA, ET AL.

No. 253.   Argued January 9, 1953.—Decided April 6, 1953.

*Assistant Attorney General Kirks* argued the cause for the United States.   With him on the brief were *Solicitor General Cummings* and *Assistant Attorney General McInerney.*

*Frederick A. Ballard* argued the cause for respondents. With him on the brief was *Joseph W. Wyatt.*

Mr. Justice Clark delivered the opinion of the Court.

This nine-year-old proceeding is for the condemnation of certain easements in land and title to sewer mains which together comprise the sewerage system of Belle Haven, a residential subdivision in Fairfax County, Virginia. It was brought under the authority of Title II, § 202 of the Act of June 28, 1941, 55 Stat. 361,[1] and a rider on the Appropriation Act of July 15, 1943, 57 Stat. 565,[2] both amendments to the Lanham Act of October 14, 1940, 54 Stat. 1125, 42 U. S. C. § 1521 *et seq.* Questions important in the administration of the Act moved us to grant certiorari, 344 U. S. 812, to review the dismissal of the government petition. 196 F. 2d 657, aff'g 101 F. Supp. 172.

During World War II, defense housing needs in the Washington area led the government to construct a large sewer project to serve defense housing properties in Fair-

---

[1] "Sec. 202. Whenever the President finds that in any area or locality an acute shortage of public works or equipment for public works necessary to the health, safety, or welfare of persons engaged in national-defense activities exists or impends which would impede national-defense activities, and that such public works or equipment cannot otherwise be provided when needed, or could not be provided without the imposition of an increased excessive tax burden or an unusual or excessive increase in the debt limit of the taxing or borrowing authority in which such shortage exists, the Federal Works Administrator is authorized, with the approval of the President, in order to relieve such shortage—

"(a) To acquire, . . . improved or unimproved lands or interests in lands by purchase, donation, exchange, lease . . . or condemnation . . . for such public works."

[2] ". . . none of the funds authorized herein shall be used to acquire public works already operated by public or private agencies, except where funds are allotted for substantial additions or improvements to such public works and with the consent of the owners thereof . . . ."

fax County. It sought to utilize, as a part of its trunk-line sewer, existing easements containing sewer pipes in the system originally constructed by respondent Belle Haven Realty Corporation. Negotiations produced an agreement under which the corporation, still holder of the fee, was to accept nominal compensation for its sewer properties on the condition that the government take the entire system and that the final order protect the Belle Haven householders against any future charges for its use. The government then filed a condemnation petition together with a declaration of taking and deposited estimated just compensation of $2. Possession was taken under court order, Belle Haven's outfalls into the Potomac River blocked off, and its sewage diverted into the government's trunk-line system. In 1948, a group of Belle Haven householders intervened as defendants, alleging that the government had leased the integrated system to the Fairfax County Board of Supervisors and that the latter had undertaken to assess a use charge of $2 per month against each householder in Belle Haven subdivision. The intervenors claimed that they were the equitable owners in fee of the Belle Haven system since the developing corporation had included its construction cost in the purchase price of their lots, that they had been granted easements of user in that system and that the use charges assessed exceeded reasonable maintenance and operation costs. The prayer was that the court, in lieu of direct compensation for their interests, protect them against having to contribute to the amortization of the integrated system. The court decided that the householders had acquired implied easements in the Belle Haven system for which they were entitled to claim compensation, and intervention was granted. 89 F. Supp. 571. But the district judge held that he could not make an award in the form of a limitation on future use charges and he denied a temporary injunction against

the collection of current bills. 89 F. Supp. 567. The intervenors then amended their answer to attack the taking as unauthorized under the Lanham Act. The Belle Haven Realty Corporation, which had not previously answered the government's petition, did so in 1950, claiming it was the legal owner of the system and entitled to its present reproduction cost, less depreciation, as just compensation.

The District Court dismissed the petition on the ground that the Lanham Act, as amended, required the consent of the intervenors as well as the realty corporation, that the corporation had only conditionally consented to the taking and that the householders had not consented at all. While the Court of Appeals approved the trial court's reading of the statutory consent requirement, it declined to base its affirmance on that ground because, "It is perfectly clear . . . that the power of condemnation given by the Lanham Act extends only to lands or interests in lands; . . . there is nothing in the act which authorizes the condemnation of a public works system such as this." 196 F. 2d 657, 662, relying on *Puerto Rico R. Light & Power Co.* v. *United States,* 131 F. 2d 491.

The original Lanham Act of October 14, 1940, 54 Stat. 1125, was designed to provide relief for defense areas found by the President to be suffering from an existing or impending housing shortage. In such cases, the Federal Works Administrator was empowered to acquire "improved or unimproved lands or interests in lands" for construction sites by purchase, donation, exchange, lease or condemnation. The quoted language describing the kind of property which the Administrator could condemn was carried over into Title II of the Act, added in 1941, which extended the statute to public works shortages in defense areas. "Public work," as defined, included sewers and sewage facilities. § 201. While the general lan-

guage "improved or unimproved lands or interests in lands" included within § 202 of Title II of the Lanham Act appears to authorize the taking here, *United States* v. *Carmack*, 329 U. S. 230, 242, 243, n. 13 (1946), it is not necessary to depend on that section alone. In 1943, the Act was amended to provide that "none of the funds authorized herein shall be used to acquire public works already operated by public or private agencies, except where funds are allotted for substantial additions or improvements to such public works and with the consent of the owners thereof . . . ." 57 Stat. 565, 42 U. S. C. § 1534, note. The 1943 amendment was in effect when the present petition was filed and its applicability here is common ground among the parties. It explicitly authorized the condemnation of such property subject to the conditions stated.

In this connection, we do not believe that the consent requirement bars acquisitions by condemnation. This interpretation would strip it of significance since the other means of acquiring property described in the statute necessarily rest on consensual transactions. Although condemnation is sometimes regarded as a taking without the owner's consent, 1 Lewis, Eminent Domain (3d ed.), § 1, it is not anomalous to provide for such consent which can, in effect, represent an election to have value determined by a court rather than by the parties. In addition, "friendly" condemnation proceedings are often used to obtain clear title where price is already settled. Cf. *Danforth* v. *United States*, 308 U. S. 271 (1939). Thus construed, all of the statutory terms are given effect.

Here, the consent of Belle Haven Realty Corporation was implicit in its promise to accept nominal damages. That consent cannot be characterized as conditional. Indeed, the corporation's answer, filed six years later, recognized this; rather than resisting the taking, it merely asserted a claim for more than nominal compensation.

Whether the intervening householders were "owners" whose consent was required is a different matter. Their interests were regarded by both courts below as implied easements or rights of user in the sewer system. It is true that easement holders have been held to be "owners" as that term is used in condemnation statutes. *Swanson* v. *United States,* 156 F. 2d 442, 445; *United States* v. *Welch,* 217 U. S. 333 (1910); cf. *United States* v. *General Motors Corp.,* 323 U. S. 373, 378 (1945). But the relevant question in those cases is whether the holders of such interests are entitled to compensation under the Constitution. The compensability of these interests is not in issue here; it follows that the cases on which intervenors rely are not controlling.[3] In deciding who are "owners" here, we look to the scheme of the Act itself. We think it unlikely that, in providing for the condemnation of public works, Congress at the same time intended to make preliminary negotiations so cumbersome as to virtually nullify the power granted. Yet the interpretation pressed by respondents would have that effect. It would compel the government, before taking public works, to deal with the holder of every servitude to which the property might be subject. We hold that intervenors were not "owners" under the 1943 amendment and that the government was not required before condemning to engage in a round robin to secure from each of them a self-serving "Barkis is willin'."

---

[3] Since the district judge deemed himself unable to order the government to restore the Belle Haven system to its original condition, the householders were remitted by dismissal of the condemnation petition to a separate action for any compensable damage they suffered because of the taking. Under this ruling, the property taken would remain part of the integrated system whether title is in the government or the realty corporation. In each case, the rights of the householders, if any, to an award remain to be determined. One effect of upholding the condemnation is to have that question tried on remand in this proceeding.

We do not pass on other issues raised by respondents, some of which if decided adversely to the government might be cured by amendment, and others we deem not ripe for adjudication because of factual questions not yet resolved.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE REED joins, dissenting.

Respondent-intervenors, the Belle Haven property owners, have paid for the property under condemnation. They are held to be "owners, *pro tanto,*" of the sewerage system under Virginia law,[1] and their interest in the system is characterized as constituting ". . . the only real value that it had." [2]   Yet, this Court holds that they are not "owners" for the purposes of a federal law, in which Congress reluctantly authorized acquisition of privately owned utilities on the condition that consent of the owners first be obtained.

One basic error underlies the decision—the assumption that Congress intended to facilitate national acquisition of going private utilities by the amended provisions of the Lanham Act.[3]   54 Stat. 1125, 55 Stat. 361, 57 Stat.

---

[1] *United States* v. *Certain Parcels of Land in Fairfax County,* 101 F. Supp. 172, 175 (D. C. E. D. Va. 1951); 89 F. Supp. 567 (1950); 89 F. Supp. 571 (1948).

[2] *United States* v. *Certain Parcels of Land in Fairfax County,* 196 F. 2d 657, 662 (C. A. 4th Cir. 1952).

[3] As I read the opinion, this must be the assumption which compels the majority to place a limiting construction on the word "owners," as used in the consent *proviso* of the 1943 Amendment, 57 Stat. 565, lest the Government be forced "to deal with the holder of every servitude to which the property might be subject," thereby making national acquisition of public works "cumbersome."

565; 42 U. S. C. § 1521 *et seq.* This error is signaled in the proposition that the 1941 Amendment to the Lanham Act, 55 Stat. 361, 42 U. S. C. § 1532, was broad enough to authorize the condemnation of utilities. The proposition is immediately glossed over with the assertion that it is unnecessary to depend on it, since the 1943 Amendment, 57 Stat. 565, 42 U. S. C. § 1534, note, which is admittedly applicable, authorizes the condemnation of such property in any event. But it makes a great deal of difference in interpreting the consent provision of the 1943 Amendment, depending on whether it is approached as a narrow restriction on an otherwise broad program for the acquisition of public utilities, or as a conditional grant of a power, theretofore withheld because of a hostility which could be avoided only by strict adherence to the condition imposed.

The purpose of the original Lanham Act of 1940, 54 Stat. 1125, 42 U. S. C. §§ 1521–1524, was to relieve housing shortages in defense areas. The 1941 Amendment added Title II to meet public utility shortages in the defense housing areas. Eminent domain powers were authorized for the accomplishment of that purpose, but only as an integrated part of a careful statutory scheme. Section 202 (a) of Title II authorized acquisition of ". . . improved or unimproved lands or interests in lands by purchase, donation, exchange, lease . . . or condemnation . . . for such public works." And Subsection (b) authorized the Federal Works Administrator ". . . to plan, design, construct, . . . or lease public works . . . on lands or interests in lands acquired under the provisions of subsection (a) . . . ." Subsection (c) authorized the Administrator "To make loans or grants, or both, to public and private agencies for public works and equipment therefor . . . ."

Simply stated, Title II authorized the Government to meet the public utilities shortage by giving aid to going

utilities, by leasing going utilities, and by constructing new utilities on land or interests in land acquired for that purpose under the Act. Nowhere is there any express or implied power to acquire going utilities.

The administrators of the law understood the statutory scheme to be as outlined above, as evidenced by their communications to Congress in pressing for enactment of the Amendment [4] and in reporting on its operation after enactment.[5] Indeed, any open request for authority to acquire going utilities undoubtedly would have precipitated a debate on the sensitive issue of public versus privately-owned utilities. Immediate post-enactment events show that had the issue been raised, the power to condemn going utilities might have been rejected out of hand.

In 1942, the Federal Works Agency attempted to condemn an entire electric system in Puerto Rico under the

---

[4] At the hearings the General Counsel to the Federal Works Agency testified with respect to H. R. 3213 (a preliminary draft, the language of which is substantially the same as Title II, for present purposes) as follows:

"And then authority is given to acquire land, improved or unimproved, and *upon the land so acquired to construct public works,* to maintain them and operate them, administer them and to lease them, to sell them, to transfer them, and also to make loans and grants for all of these purposes." (Emphasis supplied.) Hearings before the House Committee on Public Buildings and Grounds on H. R. 3213 and H. R. 3570, 77th Cong., 1st Sess. 59.

[5] *"Authority of the Federal Works Administrator under Title II.*—Under title II the Federal Works Administrator is authorized:

"(1) To construct community facilities as federal projects.

"(2) To make loans or grants, or both, for the non-Federal construction of community facilities.

"(3) To make contributions for the maintenance and operation of community facilities."

Memorandum of Federal Works Administrator attached to Report of Senate Committee on Public Buildings and Grounds, S. Rep. No. 376, 78th Cong., 1st Sess. 3.

authority of Title II of the Lanham Act. The Court of Appeals for the First Circuit held that the Lanham Act did not authorize the taking of going public utilities. *Puerto Rico Ry. Light & Power Co.* v. *United States,* 131 F. 2d 491 (1942). When Congress learned of this attempt to condemn the Puerto Rican power system, there was an immediate reaction. In 1943, when a bill was introduced to increase the appropriation authority under Title II, Senator Taft offered an amendment providing in part that

> "none of the funds authorized herein shall be used to acquire public works already operated by public or private agencies." 89 Cong. Rec. 7286.

Senator Taft explained this amendment by reference to the Puerto Rican power case, concluding as follows:

> ". . . *certainly there was nothing in the Lanham Act which authorized any such proceeding. It was intended to provide new facilities, it was not intended to provide for taking over old facilities. I think it is perfectly clear that no such power should be included in the act."* (Emphasis supplied.) *Ibid.*

Senator Maloney, who was in charge of the pending bill and had been in charge of the Lanham Act, concurred in Senator Taft's interpretation of the Lanham Act:

> "Mr. President, I can see no objection to the amendments offered by the Senator from Ohio. I agree with him that Lanham Act funds, at least in my opinion—and I was one of those who helped to write the act—were not intended to be used for such a purpose as the acquisition of a public utility in Puerto Rico. So I have no objection to the language, and as a matter of fact I share the feeling of the Senator from Ohio." *Id.,* at 7287.

The original amendment was an outright prohibition against using the Lanham Act to acquire going utilities. The comments of the legislators make it clear that the Amendment was declaratory of what Congress had understood to be the correct interpretation of the Lanham Act. But Congress was not content to leave the legislation in any form subject to doubt, lest some other Court of Appeals or this Court should place a different interpretation on the Act than did the Court of Appeals for the First Circuit.

It was not until the following day that the excepting clause was added to the Amendment. It was introduced and explained by Senator Taft. The Public Works Agency had called to the Senator's attention a case where the Navy needed to expand a railroad by a project which would require expenditure of about double the present value of the railroad. The Agency asked that in such a case they be authorized to take over the existing utility. Senator Taft said that "Even in such cases I do not think the authority should be given except with the consent of those who own the existing public works." 89 Cong. Rec. 7314. Thus the 1943 Amendment came into its present form.[6]

This legislative background shows that the excepting clause in the 1943 Amendment constitutes the entire authority given to acquire going utilities. That authority should be strictly construed in keeping with the spirit of guarded caution under which it was granted. Therefore, I would construe the class of "owners," whose consent must be had, to be at least as broad as the normal usage of that term in the eminent domain context.

---

[6] ". . . none of the funds authorized herein shall be used to acquire public works already operated by public or private agencies, except where funds are allotted for substantial additions or improvements to such public works and with the consent of the owners thereof . . . ." 57 Stat. 565.

I can agree with the majority opinion that the consent requirement does not necessarily bar acquisition by use of condemnation proceedings, but where consent of the owner is interposed as a statutory limitation on the exercise of the right of eminent domain, it makes obvious sense to interpret the consent required as being the consent of those persons having compensable interests affected by the exercise of eminent domain. The correct rule of construction has been suggested in these terms: ". . . where the law seeks to divest all and every title to land or estate and substitute the price therefor, . . . the word 'owner' should receive a broad and liberal construction so as to embrace every right in and to the land . . . ." *Glover* v. *United States,* 164 U. S. 294, 299–300 (1896). The proposition was recently restated in *Swanson* v. *United States,* 156 F. 2d 442, 445 (C. A. 9th Cir. 1946): "The term 'owner' in statutes relating to the exercise of eminent domain includes any person having a legal or equitable interest in the property condemned." [7]

The persuasion of common sense is to interpret the word "owners" as the equivalent of persons having a compensable interest under the Fifth Amendment, simply because when Congress speaks of owners in the eminent domain context, its most obvious source of reference is the Fifth Amendment. That is not to say that some other meaning might not be given by express definition, or by implication, where clearly necessary to carry out some overriding policy of the statute.[8] If there were in

---

[7] Cf. *Dubois* v. *Hepburn,* 10 Pet. 1, 23 (1836), interpreting a statute which permitted the "owner" to redeem tax delinquent land: "Any right, which in law or equity amounts to an ownership in the land; any right of entry upon it to its possession, or enjoyment, or any part of it . . . makes the person the owner . . . ."

[8] Thus in *Glover* v. *United States,* 164 U. S. 294 (1896), a mortgage creditor was held not to be an "owner" for purposes of a statute making a land tax refund, since the obvious statutory scheme was to reimburse persons who had been liable to pay the tax.

the Lanham Act what the majority opinion reads into it—a congressional policy to facilitate national acquisition of privately owned utilities—then there might be some justification to interpret "owners" from a narrower source of reference, such as administrative convenience.

The sewerage system under condemnation was built in 1925 by the Belle Haven Realty Corp. as part of the development of a residential subdivision. As lots were sold, a proportionate part of the cost of the sewer system was included in the price paid by the purchaser of each lot. The conveyance of each lot included a grant of all "appurtenances to the same in any wise belonging." Belle Haven Realty Corp. retained nominal title to the system and responsibility for maintaining it, but no charge was made for its use. On this state of facts, the District Court held that the property owners had property rights by way of easements appurtenant to the Belle Haven sewer system. *United States* v. *Certain Parcels of Land in Fairfax County,* 89 F. Supp. 571 (1948).

The District Court's finding on the nature of the property interest under Virginia law is not questioned by this Court. It has been decided that such a property interest would give the owners thereof a compensable interest in a taking by power of eminent domain. *United States* v. *Welch,* 217 U. S. 333 (1910). It should follow, from the principles of statutory construction that I have urged above, that the consent of these easement owners was required.

Perhaps there may be some practical limitation on the consents which Congress required. Thus, where there is a legal entity which may speak with proper authority for all who have an interest in the property, as in the case of a corporation or a trustee speaking for the shareholders or beneficiaries, consent of each individual owner might not be required. But the corporation cannot be

held to represent the interests of the intervenors in the present case because it had a potentially adverse interest. The corporation stood to gain relief from its burden of maintenance if the system was taken, while the property owners stood to lose their right of free use. The District Judge noted in his opinion, "It seems never to have occurred . . . to Belle Haven Realty Corporation that the individual lot owners had any interest or ownership in the sewer system." 101 F. Supp. 172, 174. It seems absurd to say that the consent provision of the statute is satisfied by getting the consent of the corporation under the circumstances. The legal inadequacy of the corporation's consent is not changed because the corporation, despite its potentially adverse interest, made a genuine effort to do what it thought best for the property owners. Intervenors' interests are not so inconsequential in the law of eminent domain that they can be left to the beneficence of someone having a potentially adverse interest. That much is admitted by the inference that they are entitled to claim just compensation in their own right. Why are they any less entitled to give or withhold consent in their own right?

Even if consent of the corporation would satisfy the statute, I cannot agree that its consent was ever obtained. In 1943, when the Federal Works Agency was seeking only an easement of flowage through the lower end of the Belle Haven trunk line, the corporation consented to the taking if the Agency would take the entire system and provide in the decree that no service charges would be imposed against the Belle Haven property owners.[9] The original petition of condemnation, filed in 1944, evidences

[9] It is interesting to note that this agreement was apparently reached in the "spring of 1943," which would place it prior to the enactment of the 1943 Amendment, which was on July 15, 1943. Thus, it is a little difficult to believe that the Corporation was giving or the Government seeking a consent under the statute.

no intent to proceed under terms of this consent. The petition did not plead consent. It did not seek to condemn the entire sewer system, nor did it make any provision for the protection of the property owners. Not until 1948, when the Government's lessee, Fairfax County, ran into trouble in trying to levy a uniform sewerage assessment, did the Government try to take the entire system. Even then, its amended petition did not plead consent nor make any provision for protection of the property owners. Indeed, the only apparent purpose behind its amended petition was to acquire clear title to the whole system so that its lessee could assess charges against the Belle Haven property owners.[10] I can only conclude that the attempt to find a consent in the 1943 agreement came as a happy afterthought with the awakening realization that this taking could not be justified except under the 1943 Amendment.[11]

---

[10] This is the conclusion reached by the Court of Appeals. 196 F. 2d 657, 662–663. To some extent the conclusion depends upon questions of fact which have never been tried. But most of what there presently is in the records supports the inference that the federal power of eminent domain was exercised here to help a local county solve a problem of sewerage assessments. If this be true, I think the whole affair is completely unworthy of the high trust which should attend use of the sovereign power of eminent domain. However, that raises a question of fact going to whether or not the taking was for a public purpose. That question, as well as the factual questions of whether the President approved this specific project as required by Title II, *Puerto Rico Ry. Light & Power Co.* v. *United States,* 131 F. 2d 491, 495–496 (C. A. 1st Cir. 1942), and whether funds were allotted "for substantial additions or improvements" to the Belle Haven system, as required by the 1943 Amendment, will still be left open on remand.

[11] In proceedings in the District Court the Government referred to Belle Haven Realty Corp. as the *"purported owner"* of the system, 101 F. Supp. 172, 175, a position quite inconsistent with its later position that the corporation was *the* "owner" whose consent brings the taking within the 1943 Amendment.

In any event, it was found as a fact that the corporation's consent ". . . was given upon a condition which the government is unwilling to accept." [12]  Unless there is something in the foregoing pattern of facts which amounts to an absolute consent as a matter of law, that finding of fact cannot be dismissed with the rhetorical response that the consent cannot be characterized as conditional.  I would not allow the Government to justify this taking by resort to an agreement which it has refused to honor.

I do not think a consent can be salvaged out of the corporation's answer seeking just compensation.  That answer came in 1950, only after the decision of the District Court that the property owners had a compensable interest in the system and a right to intervene.  89 F. Supp. 567.  The answer pleads a belief that the conditional consent had been violated and states its primary purpose to serve the interest of the property owners.  Thus, though it does ask for just compensation, the only fair construction that can be given to the answer in its entirety is that it is an alternative plea, attacking the right to take on the belief that the conditional consent had been dishonored, or alternatively seeking just compensation for its interest in the sewer if the Government's right to take should be upheld.

The condemnation of one small sewerage system may seem an insignificant thing in view of the vast scope of federal eminent domain powers, and much of the impact of the present decision may be balmed over with the assurance that intervenors can claim just compensation for their losses.  But there is something at stake here which transcends the immediate interests of the parties.  That

---

[12] 196 F. 2d 657, 662.  There were no formal findings of fact. But as the Court of Appeals pointed out, "The [district] judge found it [the language quoted in text] as a fact, . . . after hearing the parties in a number of pre-trial conferences."

is the duty of the courts and administrators to keep faith with Congress in the interpretation and execution of a statute in which Congress carefully limited the powers of eminent domain because of sensitive policy considerations which were for Congress alone to evaluate. Because I think the instant condemnation clearly exceeds the scope of congressional authorization, I would affirm the judgment of the courts below.