588 F.2d 45
 Margaret KLUGH, Katherine Klugh Maultsby, Mary Klugh Garner,
John Bradley Klugh, William W. Bradley, III, Frederick H.
Bradley, Patrick H. Bradley, Edna Bradley Troxell, Hugh W.
Bradley, Mabel Bradley Payne, Mary Bradley Pressly, Thomas
R. Bradley, William T. Bradley, Margaret Bradley Poole,
Davis W. Bradley, John T. Bradley, Jr., Frances K. Bradley,
Mark E. Bradley, Jr., Elizabeth Bradley McGarity, Robert F.
Bradley, III, Thomas J. Bradley, Frances Wright Bradley,
III, Mary Bradley Brown, Rufus A. Johnson, III, William R.
Bradley, II, Margaret Bradley Shuford, Arthur L. Bradley,
James B. Bradley, Curtis L. Bradley, Davis J. Wardlaw,
Martha Wardlaw Buie, Forest Bradley Wardlaw, Jr., Ivey Jean
Wardlaw Pressly, Robert S. Wardlaw, William W. Wardlaw,
Mildred E. Wardlaw, John U. Wardlaw, Mary Wardlaw Deason,
Annie Wardlaw Wright, Frances M. Wardlaw, John K. Bradley,
Mary Bradley Miller, Martha Bradley Moody, Frances Trenholm
Bradley, Jane H. Bradley, Martha B. Mayo, Robert F. Bradley,
JTIUNITED STATES of America, certain lands located in
Abbeville, Greenwood and McCormick Counties, South Carolina,
being a portion of the estate of W. K. Bradley, Deceased,
and the United States Department of Agriculture, Appellees.
 No. 77-1678.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 2, 1978.
Decided Nov. 17, 1978.
 
 J. Fred Buzhardt, Beaufort, S. C. (Barry L. Johnson, Dowling, Dowling, Sanders & Dukes, Beaufort, S. C., Joseph O. Rogers, Jr., Rogers, Riggs & Rickenbaker, Sumter, S. C., on brief), for appellants.
 Carl Strass, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Acting Asst. Atty. Gen., Washington, D. C., Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., James D. McCoy, III, Asst. U. S. Atty., Greenville, S. C., Edmund B. Clark and James R. Arnold, Attys., Dept. of Justice, Washington, D. C., on brief), for appellees.
 Before WINTER, BUTZNER and HALL, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The principal question in this appeal is the meaning of the will of W. K. Bradley of South Carolina who died on December 30, 1881 with respect to the persons in whom the fee of his real property vests. The question arises because certain of the testator's lineal descendants claim that, as devisees under the will, they have property interests in land previously owned by him which were not validly acquired by the United States in several condemnation proceedings undertaken in 1936-39 pursuant to §§ 7 and 8 of the Weeks Act, 16 U.S.C. §§ 516, 517, 517a. The condemnation proceedings were ineffective to acquire their interests, they allege, because they were not parties to the proceedings nor did they consent to the condemnations. In their suit against the United States, they sought return of their property and also an accounting for its use since the date of the purported taking.
 
 
 2
 The district court interpreted the will to vest the remainder in fee twenty-one years after the death of the testator; and since all of the persons having any interest in the property under that construction were parties to the condemnation proceedings and offered no contest, it granted summary judgment for the government. We do not think that under the will the fee will vest until twenty-one years after the death of the survivor of the children and grandchildren of the testator, living at his death, to whom he devised successive life estates.
 
 
 3
 Anticipating that this might be the decision we reach concerning the meaning of the will, the United States also asserts that (a) the suit is barred by limitations, and (b) the consent of minors, unknown persons and persons unborn who may have an interest in the property need not be obtained in order for the property to be condemned validly. We conclude that it would be premature for us to pass upon these questions until another question that we perceive, but which has not been briefed or argued by the parties, is resolved. Accordingly, we reverse the judgment of dismissal and remand the case to the district court for further proceedings.
 
 I.
 
 4
 W. K. Bradley died on December 30, 1881; his will was dated December 8, 1881. He was survived by his widow, Sarah Frances Wideman Willis Bradley; his five children, John E., Robert Foster, George Clarence, William Tatum and Sarah Frances Bradley Thomson; and twelve grandchildren. Of this group, the last to die was Annie Elizabeth Bradley Wardlaw, a granddaughter. She died January 21, 1967.
 
 
 5
 The pertinent portion of the will, the text of which is set out in the margin,[1] left the testator's real property and mills to his wife and children "to be theirs and for their use and benefit for life, and after their death to go to their children and on down as far as the law will allow." Although the will did not establish a formal trust and name trustees, it provided for the management of the property, gave the heirs the right to occupy the property upon paying rent, and provided for an annual distribution of the net income of the estate to each member of the family entitled thereto. The testator directed that the estate "shall be perpetuated in my family," and he forbade both the sale of any portion of the property and application of the distributive share of the annual net income to satisfy the debts of any member of the family.
 
 
 6
 The estate included many acres of land, some of which was cultivated, some of which was pasture land, and some of which was improved by buildings and dwelling houses.
 
 
 7
 In 1910, the will was interpreted by the Court of Common Pleas of Abbeville County, South Carolina. At that time the testator's widow had died, as had three of his five children. One of his deceased children had left a widow who instituted the litigation, and another of the deceased children had left surviving him "numerous children, some of whom were not in being when the testator died." Bradley v. Bradley, Court of Common Pleas, Abbeville County, South Carolina, decree entered September 30, 1910 (unreported). In the suit, the widow sought a partition and division of the estate and an accounting of the yearly income alleging that, under the South Carolina rules of intestate succession, she had succeeded to her husband's interest and to his share of the interest of his mother and his sibling who died without issue, both of whom also died intestate. The Court ruled otherwise, holding:
 
 
 8
 The testator, as is shown by a consideration of the Will, intended to devise the whole of his estate and to die intestate as to none of it; and there is an entire lack of evidence necessary to overcome the presumption against partial intestacy.
 
 
 9
 The strongest and most conclusive ground, however, is the very evident intention of William K. Bradley to perpetuate the estate in his family as far as possible, and to create the life estates sub-ordinate and sub-servient to this purpose. In construing the terms of a Will, the obvious intention of the testator, provided it is not inconsistent with an established rule of law or repugnant to public policy, always controls. . . .
 
 
 10
 The intention of the testator herein expressed is neither inconsistent with established rules of law nor repugnant to public policy. The life estates were devised to the heirs-at-law "to be theirs and for their use and benefit for life, and after their death to go to their children and on down as far as the law will allow." In case a life-tenant dies without leaving children, the life tenancy merges again in the common property, and the widow or widower as the case may be, takes no interest. If there are any children they share as representatives of the parent. Any other construction would defeat the clearly apparent intention of the testator.
 
 
 11
 Accordingly, the South Carolina court decreed an accounting of the net income of the estate with distribution to be made one-third (1/3) to each of the testator's two surviving children and one twenty-first (1/21) to each of the seven children of the deceased child of the testator who died with issue.
 
 
 12
 Some of the lands of the estate were condemned by the United States in 1936 (164.40 acres, part of a total condemnation of 1,744.10 acres in McCormick County, S.C.), in 1937 (2,003.70 acres, part of a total condemnation of 4,177.30 acres in Greenwood and McCormick Counties, S.C.), and in 1939 (1,074.20 acres, part of a total condemnation of 1,922.10 acres in McCormick and Abbeville Counties, S.C.) to establish a national forest. The condemnations were conducted under §§ 7 and 8 of the Weeks Act, 16 U.S.C. §§ 516, 517 and 517a, one of the provisions of which is that the United States shall Not acquire lands under that Act "until the legislature of the State in which the land lies shall have consented to the acquisition of such land . . . ." South Carolina did consent to the condemnation, S.C.Code § 3-1-410, but its consent was conditioned upon "the consent of the owner . . . (as to) any building, dwelling house or cultivated or pasture lands."
 
 
 13
 In the instant case, plaintiffs alleged that most of the condemned lands fit into the category requiring individual owner consent. It is apparently not disputed that those of the adult lineal descendants of the testator who had life estates at the time of the several condemnation proceedings consented, at least to the condemnation of their life estates, but it is claimed that they did not consent to the condemnation of their undivided interest, if any, in the contingent remainder in the fee. The government makes no claim that guardians or legal representatives of unknown or unborn heirs were named and served in the condemnation proceedings, but it does assert that publication of the desire of the United States to acquire the lands against "unknown, nonresident or minor" owners was made pursuant to S.C.Code § 28-7-10.
 
 
 14
 Although the exact number and the identities of the present holders are not clear in the record before us, it appears also that, if the will is interpreted not to vest the fee until 21 years after the death of the last survivor of the lives in being at the date of death of the testator, some life estates have come into being subsequent to the condemnation proceedings. Indeed, under that construction additional life estates may come into being until 1988, and not until January 21, 1988 (or October 21, 1988, if, on January 21, 1988, a putative taker is En ventre sa mere ) will the ultimate takers of the fee be known.
 
 
 15
 The district court construed the will as expressing an intention to devise life estates to successive lineal generations As a class "as far as the law will allow." The quoted phrase, the district court concluded, indicated recognition by the testator that a perpetual devolution of generational life estates is limited by law. By application of the rule against perpetuities, the district court ruled that the fee interest in the testator's property vested in the testator's great-grandchildren living 21 years after the testator's death. The district court found support for its ruling in the management provisions of the will and thought that its result created useful, rather than continuously fragmented, life estates. Having placed this construction on the will, the district court found that the eleven great-grandchildren, alive 21 years after the death of the testator and alive also on the dates of the condemnations, had been served and did not contest the condemnations, with the result that the district court entered judgment for the United States.
 
 II.
 
 16
 As the Court of Common Pleas in the 1910 construction case stated, "the obvious intention of the testator, provided it is not inconsistent with an established rule of law or repugnant to public policy, always controls. . . ." This is as much the law of South Carolina today as it was in 1910 or in 1881 when the will became effective. See Shelby v. Shelby,244 S.C. 598, 137 S.E.2d 851 (1964); Shelvin v. Colony Lutheran Church,227 S.C. 598, 88 S.E.2d 674 (1955); Green v. Green, 210 S.C. 391, 42 S.E.2d 884 (1947). As is manifest, the intention of the testator in the instant case was to postpone the ultimate devolution of his estate for "as far as the law will allow," creating in the interim prior to ultimate devolution a series of life estates, determined in the 1910 construction case to be measured in quantum by Per stirpes distribution, and not Per capita. The questions in this case thus become, First, how long does the law allow, and Second, what did the testator mean by the use of the phrase, for the answers to these questions will determine in whom was the fee vested in the 1936-39 condemnation cases and whose consent was required with respect to the condemnation of any buildings, dwelling houses, or cultivated or pasture lands.
 
 
 17
 The limitation of the law on the postponement of the vesting of the fee is the rule against perpetuities, which is recognized as the law of South Carolina. Cox v. Buch, 39 S.C.L. 604 (1851). The rule is that a future interest must vest within a life or lives in being at the time that the interest is created plus 21 years and the period of periods of gestation, where applicable. See Restatement of Property §§ 370 and 374. The operation of the rule in the instant case depends upon the proper interpretation of the testator's will, and it is this to which we now turn.
 
 
 18
 Basically, we must decide whether the testator intended his estate to devolve on successive Classes of descendants or whether his intent was to create successive life estates in his descendants individually for as long as the rule against perpetuities might allow. This determination of intent is critical because the length of time during which future interests are permitted to survive is shortened where the testator intends the gifts to his descendants to be by classes. See Restatement of Property § 383. This is so because under the majority view the rule against perpetuities is violated and the remote interests voided if the period prescribed by the rule May be exceeded, not whether it Actually is exceeded.[2] See Black v. Gettys, 238 S.C. 167, 119 S.E.2d 660, 664 (1961). Thus, a devise of a life estate to grandchildren with remainder over to great-grandchildren as a class would violate the rule, because it is possible that a great-grandchild may be born more than 21 years after the death of a life in being at the time of the testator's death. Where it is possible that the interest given to one member of the class may violate the rule against perpetuities, the gift is void as to the entire class. As a consequence, in the example cited, the fee would vest in grandchildren in order to avoid running afoul of the rule against perpetuities.
 
 
 19
 We do not think, however, that in the instant case the testator intended to make class gifts under the will in question. It is true that for his heirs and descendants more remote than his widow and five children, to whom he referred by name, he employed only the word "children" and that there is a rule of construction that the use of such a phrase usually limits a class gift. Restatement of Property § 279. The use of the word "children" might denote an intention to create a class gift, but its use might equally be explained by the fact that some of the testator's intended takers were not yet in being and the testator could not know their names. In any event, the rule is simply a rule of construction, and it is subservient to any contrary intention of the testator expressed elsewhere in his will.
 
 
 20
 We think that in the will in question the testator expressed the intent not to be bound by the usual rule of construction arising from his use of the term "children" and that he intended to postpone the vesting of the fee interest in his property for the longest period that the rule against perpetuities would permit. First, the testator employed the phrase, in describing the postponement of vesting, "to their children and on down As far as the law will allow." (Emphasis added.) We think that this means for the maximum period that the rule against perpetuities would permit under any reasonable construction of the will. Similar language was given this construction in Fitchie v. Brown, 211 U.S. 321, 29 S.Ct. 106, 53 L.Ed. 202 (1908); Gale v. Gale, 85 N.H. 358, 159 A. 122 (1932); and Stellings v. Autry, 257 N.C. 303, 126 S.E.2d 140 (1962). Second, the testator articulated his intent that his estate be "perpetuated in (his) family," and he reinforced this expression by spendthrift provisions and management provisions. This, too, evidences an intention for the restriction to continue as long as possible under any reasonable construction of the will and negatives an intention to make a class gift which would have the effect of shortening the period. Unlike the district court, we do not think that the negative inference to be drawn from the testator's failure to provide for the selection of a manager or executors beyond the generation of his children is sufficient to overcome his other expressions that vesting be postponed beyond the death of his children.
 
 
 21
 Thus, taking as the measuring life the survivors of those mentioned in the testator's will who were alive on the date of his death (his widow, his five children and his twelve grandchildren), See Fitchie v. Brown, 211 U.S. at 330-34, 29 S.Ct. 106, we hold that, under the proper interpretation of the will, the fee to the testator's lands will not vest until January 21, 1988, and possibly as much as nine months later. On remand, the district court should reevaluate the effect of the service of process and failure to contest in the 1936-39 condemnation proceedings as defense to plaintiffs' claims in the light of this holding.
 
 III.
 
 22
 The government also asserts other legal defenses to the suit. It contends, first, that the action is in substance a quiet title action and that the twelve-year statute of limitations contained in 28 U.S.C. § 2409a(f) bars suit since more than twelve years have elapsed since 1939, the date of the last taking. Its second defense is that, under § 8 of the Weeks Act, as amended, 16 U.S.C. §§ 517 and 517a, and such authority as United States v. County of Fairfax, Virginia, 345 U.S. 344, 348-49, 73 S.Ct. 693, 97 L.Ed. 1061 (1953), the United States is not obliged to join remote possible claimants in order to acquire fee simple title by condemnation; and therefore the United States acquired good title in the original condemnations in the instant case.
 
 
 23
 Of course, plaintiffs vigorously challenge these contentions. With respect to the defense of limitations, they assert that (a) the district court retained jurisdiction in the condemnation cases and the instant action is merely a reopening of them and not a suit to quiet title under 28 U.S.C. § 2409a,[3] (b) the instant case is a motion under F.R.Civ.P. 60(b)(4) to attack a void judgment,[4] and (c) even if the suit is deemed an action to quiet title, limitations cannot begin to run until title vests and until any title holders cease to be minors. With respect to the joinder of "remote" owners, plaintiffs stress that this is a case, unlike most condemnation cases, where the consent of all owners is required before the United States has any authority to condemn.
 
 
 24
 Except for our comment in the margin, we express no views on these various legal issues. We decline to do so for two reasons. First, we cannot tell from the record before us who, of the putative takers of the fee, was in being at the time of the condemnation actions and whether specific notice was given to them. Second and more importantly, we find from our examination of the papers in each of the condemnation cases that the unknown heirs and assigns of the testator and some or all of his children were alleged to have a property interest in the Bradley property taken and proceeded against by publication in accordance with S.C.Code § 28-7-10 and its predecessors. However, guardians Ad litem were not appointed to represent unknown heirs of the testator while guardians Ad litem were appointed to represent known minor owners and, in one case, an owner who was incompetent.
 
 
 25
 Thus we think that, before the defenses asserted by the United States are adjudicated, it is necessary to decide what was the legal effect of joining the unknown heirs and proceeding against them by publication when they were not represented by guardians Ad litem and did not participate in the proceedings. An important factor, we think, in the resolution of this question is the requirement of §§ 7 and 8 of the Weeks Act and of S.C.Code § 3-1-410 requiring the consent of the owners as to the condemnation of any building, dwelling house, or cultivated or pasture lands sought to be condemned, although we express no view on the weight to be given this factor. Neither in their briefs nor in oral argument have the parties addressed the question of the effect of joining unknown heirs and proceeding against them by publication but without the appointment of a guardian Ad litem. It should be addressed in an adversary proceeding because upon its resolution may depend the outcome of this law suit; its resolution may obviate the necessity of considering the validity of the government's other defenses.
 
 
 26
 Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings in accordance with this opinion.
 
 
 27
 REVERSED AND REMANDED.
 
 K. K. HALL, Circuit Judge, dissenting:
 
 28
 The dispositive issue in this case is whether the testator intended to bestow his benefice upon his descendants individually, or upon as many generational classes of descendants as the law would allow.
 
 
 29
 The devise in question is made to the testator's wife, W, and to his children, namely, U, V, X, Y, and Z for their use for life "and after their death to go to Their children and on down as far as the law will allow."
 
 
 30
 I think these terms of devise clearly express an intent to have interests in the estate following the life estates pass successively to as many generations, As classes, as legally possible, with the remainder of the estate vesting in that most distant generational class which the law would permit. It is well established that the Rule Against Perpetuities voids all class gifts to any generation of descendants beyond the class of the testator's grandchildren. Gray, The Rule Against Perpetuities, Ch. 10 (4th Ed. 1942). Therefore, I think the remainder of the estate has vested in the already-determined class of the testator's grandchildren and any remand of this action should be for the limited purpose of discovering whether those grandchildren or their heirs received proper notice of the condemnation proceedings.
 
 
 31
 The inherent class nature of the testator's gifts to successive generations is supported by three considerations.
 
 
 32
 First, the testator had twelve grandchildren living at the time of his death but chose to refer to them merely as his children's children, evidencing, as the majority notes, a clear intent to benefit all his grandchildren regardless of when born. Such a gift is, by definition, a class gift. 4A Thompson on Real Property, § 2002 (1961 Repl. Vol).
 
 
 33
 Second, absent specific indicators to the contrary, it is presumed that a testator intends to treat equally family members of equal standing that is, as generational classes of descendants. 5 American Law of Property, § 22.2 (A. J. Casner Ed. 1952). If the testator had intended to devise individual gifts to descendants, following the life estates in named persons, he would, in all likelihood, have named the grandchildren alive at his death as devisees because they would have been known to him as individual objects of his affection. He chose not to name them but rather referred to them merely as his children's children, giving them no preference over grandchildren who might be born after his death.
 
 
 34
 Third, early vesting of estates is always preferred by courts in the construction of wills. This is the very purpose of the Rule Against Perpetuities: to facilitate the free alienation of property which in turn helps assure its proper maintenance and changing use as dictated by the changing circumstances of its various owners and of society as a whole. Thompson, Supra at § 2018. Rules of construction have time-honored places in property law because of the important social interests they represent. Where a testator intends to tie up his estate for as long as possible, thus creating a great burden upon his family and upon society, his intent should be expressed in very plain terms and should never be found by courts upon implication especially where, as here, a much more plausible intent is presented by the express language of the will.
 
 
 35
 The majority finds that the testator's overriding intent was to tie up the estate for as long as possible. In order to accommodate this overriding intent, the majority has construed the testator's undefined gifts to successive generations which it concedes are couched in the language of class gifts to be instead individual gifts because such a construction would tie up the estate much longer than class gifts. Under this construction the remainder of the estate will vest after the death of the last family member who was alive at the time of the testator's death in this case, twenty-one years after the death in 1967 of an unnamed grandchild, or 107 years after the death of the testator.
 
 
 36
 The majority's analysis does not hold up under close scrutiny of the language in the will. First, it construes the terms, to "their children and on down as Far as the law will allow," out of context. These words are characterized as a description of the postponement of vesting rather than as terms of devise which identify the interests created and the devisees. In effect, by begging the question, the majority construes these terms to mean "for as Long as the law will allow." See Fitchie v. Brown, 211 U.S. 321, 328, 29 S.Ct. 106, 53 L.Ed. 202 (1908). But those are not the testator's words, and that construction violates the meaning of the terms used by the testator when read as part of the sentence in which he named members of his immediate family and the life estates they were to take under the will. In that sentence, he identified other participants in the estate generally as his "(children's) children and on down." He did not specify the interest to be conveyed to those unnamed descendants but did, I think, intend to identify the ultimate takers as that generation most distant from his which could legally take under the will "as Far as the law would allow." He did not use these terms to describe the postponement of vesting; he used them to identify the objects of his benefice.
 
 
 37
 Second, the majority supports its construction by generally reciting the testator's express intent to perpetuate the estate in his family. This statement does not qualify his gifts to classes of descendants. It means the testator wanted to have generation after generation benefit by the terms of the will. But he acknowledged that such a grandiose intent was not permitted by law. He did not have a singular intent to tie up his estate for as along as possible; he intended to include every member of each generation regardless of when born.
 
 
 38
 Third, the majority finds that the inclusion of provisions for management of the estate support its construction. These provisions do not establish a grand scheme for the perpetual management of the estate. The testator's primary concern, as noted by the district court, was for the management of the estate during the pendency of the life estates which he devised to his wife and children, each of whom he named. The testator specified that those persons hold their life estates in common and that they were to elect a family member to manage the estate. Beyond this no comprehensive scheme of trusteeship was established. In fact, the scant provisions for management of the estate and the distinction drawn between named individuals and the generations following them support a construction favoring class gifts to those successive generations.
 
 
 39
 In conclusion, the express terms of the devise to successive generations are inherently terms of class gifts. The rules of construction for the vesting of estates and for the equal treatment of descendants of equal standing and affection to the testator strongly militate against the construction found by the majority. Therefore, I respectfully dissent.
 
 
 
 [1]
 I will that all of my land and mills viz (testator here enumerates his real property in South Carolina) or any other lands that I may die possessed of in any State or Territory in the United States and all of my personal property, consisting of notes, mortgages, accounts, and money, life Stock, etc., be given to my dearly beloved wife Sarah Frances Bradley and my children namely John Edward Bradley, Robert Foster Bradley, George Clarence Bradley, William Tatum Bradley, and Sarah Frances Thomson to be theirs and for their use and benefit for life, and after their death to go to their children and on down as far as the law will allow. I intend it shall be perpetuated in my family, and not to be disposed of in any way for the debts of any one or all the family any members of the family can settle on any one of the places by all agreeing as to the value of the rent he must account for: if the family cannot agree as to the value of such place or places, then disinterested parties must be called in and they must fix a price to such place or places. I further will that all of my family, wife and children be a power to select some one of the family to transact all of the business connected with the Estate who must keep a book of receipts and expenditures for each year said Agent to be chosen annually, and on the first Monday in January of each year make a just settlement with each member of the family of the net proceeds of the Estate. That my intention may be more fully understood, with regard to the interest of each of the above named members of the family, that the property be kept in common and that each distributive share for each year must go to each of the above named heirs an and for their use and benefit, and not to pay any note or indebtedness to any or all of said heirs. In regard to the interest that my dearly beloved wife must have in the Estate, I further will her the above described Home place, houses and all the furniture, household and kitchen, all stock horses, mules, cattle, hogs, etc., to be hers for life and at her death to revert to the Estate. And I further will that she have an equal share of the annual proceeds of the Estate, during her life time to dispose of as she may think best. And as all of my children are of age I further will that each of them become Executors of this my Last Will and Testament Thomas P. Thomson representing my daughter Sarah Frances Thomson. Any personal property may be sold by those of the family agreeing as to time and price. Any member of the family who does not conform to the requirements of this will shall be disinherited by the order of the will
 
 
 [2]
 This is the so-called "what-might-happen" approach in applying the rule against perpetuities. The more modern approach, adopted in a number of states (but not South Carolina) and advocated by the draftsmen of the proposed Restatement of the Law Second, Property (Tent. Draft No. 1, March 15, 1978), is the "wait-and-see" approach under which the determination of whether an interest fails under the rule against perpetuities is made on the basis of what does happen and not what might happen. See Restatement (Second) of Property, Comment d, Statutory Note to Section 1.4, and Reporter's Note to Section 1.4 (Tentative Draft No. 1, 1978). See also summary of discussion of Tentative Draft No. 1 at American Law Institute Meeting, May 1978, 46 U.S.L.W. 2635 (May 30, 1978)
 
 
 [3]
 From our examination of the papers in the condemnation actions, we think that this contention is lacking in merit. In the order each of the three condemnation actions confirming the jury's verdict, the district court directed payment of the verdict into the registry of the court and, upon payment, authorized the clerk to execute a deed conveying title to the United States. In each of such orders, the court added, "Let this cause remain open for such other and further orders, decrees and judgments as may be necessary in the premises," or words of similar import. Significantly, however, in subsequent orders making final distribution of the moneys in the court's registry, no such reservation of jurisdiction was recited. We think that the language reserving jurisdiction was limited to subsequent orders to disburse the proceeds, not to reopen the proceedings, and that jurisdiction was exhausted when final distribution was made
 
 
 [4]
 In denying the government's motion to dismiss for lack of jurisdiction, the district court ruled that the instant proceeding "is really a continuation of the original action by way of motion either under 60(b) or by independent action in equity, which is ancillary to the main action." The whole problem about the district court's jurisdiction stems largely from the fact that the jurisdictional allegations of the complaint are patently deficient. While plaintiffs alleged that "the parties hereto, the subject matter hereof and all things hereinafter alleged are within the jurisdiction of the (district court)," no statute, rule or other jurisdictional base was alleged. On remand, the district court should require that the complaint be amended to comply with F.R.Civ.P. 8(a)(1)